V. H. JUERLING & SONS, INC. *v.*
FIRST NATIONAL BANK OF RICHMOND, ET AL.

[Nos. 30998, 31027, 31028, 31029. Filed December 5, 1968. Rehearing denied January 16, 1969. Transfer denied June 11, 1969.]

*David W. Dennis, Dennis, Dennis & Reinke,* of Richmond, for appellant.

*William H. Vobach, Hugh E. Reynolds,* Indianapolis, *Russell H. Schussler,* Richmond, *Lock, Reynolds, Boyd & Weisell,* of counsel, Indianapolis, and *Harlan, Harlan, Schussler & Keller,* of counsel, Richmond, for appellees.

COOPER, J.—This appeal is from summary judgments rendered pursuant to Sec. 2-2524 of Burns' Indiana Statutes, Anno., in the Wayne Circuit Court, wherein the Appellant, V. H. Juerling and Sons, Inc., by four separate complaints alleged, in substance, that an employee of said appellant forged certain checks, made them payable to herself and cashed the same at the First National Bank and the Second National Bank, both located in Richmond, Indiana, and appropriated to her own uses the proceeds so obtained.

We judicially know that these causes have previously been before our Supreme Court upon a constitutional question raised by the appellant herein and that the issue so raised was decided adversely to the appellant. Also, we judicially know that prior to the Supreme Court's decision, it ordered the four causes to be consolidated for the purpose of briefing and argument, because of the similarity of the facts involved in each case and also because the legal issues involved in each cause are substantially the same. (See 236 N. E. 2d 45, 250 Ind. 512, 14 Ind. Dec. 120, Supreme Court Rule 2-7.)

For the purposes of this appeal, we have reviewed and considered the records of each of the consolidated causes separately and distinctly as independent causes. However, in reviewing each of the records, we are of the opinion that the pertinent factual situation and the law applicable thereto, is so similar that we are writing one opinion to dispose of the legal propositions advanced in the several causes by all parties to this appeal.

We further state that in reviewing the records now before us, together with the finding and opinion rendered by the trial judge, that certain parts thereof will be adopted as our own.

We are of the opinion that the sole question before this Court for our consideration is, whether under the evidentiary facts as shown by the records now before us, the appellees herein were entitled to a summary judgment as a matter of law pursuant to Burns' Anno. Statutes, Sec. 2-2524.

It appears that the appellant herein filed four complaints in the Wayne Circuit Court against the Second National Bank and the First National Bank, both of Richmond, Indiana, and said causes were numbered 39100, 39101, 39102 and 39103, in said Court. The record reveals that in each of the foregoing causes, the appellant averred in substance, that one Josephine Coffman, a bookkeeper employed by the appellant, forged the name of appellant's officers on certain checks

that were made payable to her, which she endorsed and cashed at said banks and thereafter she appropriated the money so obtained to her own use. It is also alleged that these checks were charged against the appellant's bank account as a depositor. Each complaint demands judgment against the named bank for the total amount of such forged checks.

In reviewing the pleadings contained in the record, we note also that the aforesaid Cause # 39100 is based on breach of contract against the Second National Bank and demands judgment for $67,058.23 for forged checks drawn against the bank, paid by it, and charged to the account of the appellant as a depositor of said bank from January 2, 1951, to November 28, 1955.

Likewise, Cause No. 39101 is against the Second National Bank and is in two pleading paragraphs. Paragraph one of the complaint is based on negligence of said bank and demands judgment for $67,058.23 for the forged checks drawn against the bank and negligently paid by it and charged to the account of the appellant as a depositor at its bank from January 2, 1951, to January 28, 1955. Paragraph two of the complaint is based on negligence of said bank and demands judgment for the sum of $12,302.50 for forged checks drawn against the First National Bank of Richmond, Indiana, payable to Josephine Coffman, and negligently paid by the Second National Bank on her endorsement of the checks for which checks it received payment from said First National Bank, which then charged them against the account of the appellant as a depositor at the First National Bank from January 28, 1955, to November 8, 1955.

Cause No. 39102 is against the First National Bank and is based on breach of contract and demands judgment for $12,602.50 for forged checks drawn against said bank, made payable to Josephine Coffman, who endorsed and cashed the same at the Second National Bank, which bank received pay-

ment of the same from the First National Bank, which then charged such checks against the account of the appellant as a depositor of the First National Bank from January 28, 1955, to November 8, 1955.

Also, Cause No. 39103 is filed against the First National Bank and is based on negligence and demands judgment for $12,602.50 for the same forged checks described in Cause No. 39102, cashed at the Second National Bank and paid by the defendant First National Bank, and charged to the account of appellant as a depositor at the First National Bank from January 28, 1955, to November 8, 1955.

The record reveals that after the proper issues were joined, the appellees herein filed a motion for summary judgment pursuant to Sec. 2-2524, paragraph C, Burns' Indiana Statutes, Anno., stating therein that the facts admitted in the pleadings and the depositions of Josephine Coffman, and of Robert Juerling and Charles M. Brady, who were respectively, President and Secretary-Treasurer of the appellant corporation, and Bernard Massann, an accountant for the appellant, affirmatively show that there was no genuine issue as to any material fact and that the appellees were entitled to judgment as a matter of law. Said depositions were taken in Cause No. 39100 and the parties agreed that the same be used and considered in each of the four causes.

It appears that the trial court, after a hearing on said motions for summary judgment, entered the following findings of fact:

"The plaintiff, V. H. Juerling & Sons, Inc., is a corporation organized in 1945 and ever since engaged in the business of general building construction as a general contractor in Richmond, Indiana, where its office is located. The officers of the plaintiff corporation after 1949 until May, 1956, were Robert Juerling, President and Charles M. Brady, Secretary and Treasurer, and both living in Richmond, Indiana. From 1945 to November 19, 1955, Josephine Coffman was employed by plaintiff as its bookkeeper and

clerk at a salary of $50.10 a week and living in Richmond, Indiana.

"Ever since 1945 the Defendant, the Second National Bank of Richmond, Indiana, has been operating a bank in Richmond, Indiana, and ever since 1954, the Defendant, the First National Bank, has been operating a bank in Richmond, Indiana. In 1945 the plaintiff began its bank account with the defendant the Second National Bank, and continued its account with that bank until January 28, 1955, and during such time deposited all of its monies with that bank. On January 28, 1955, the plaintiff closed its bank account with Defendant, the Second National Bank, and transferred its bank account to Defendant First National Bank and, thereafter, deposited all its money with the said First National Bank.

"At all times while Plaintiff had its account with said banks, each of said banks had in its possession the signature cards of said officers Robert Juerling and Charles M. Brady and knew their signatures, and also knew that said persons as President and Secretary and Treasurer of the plaintiff were the only persons authorized by the plaintiff to sign checks on behalf of the plaintiff as a drawer against each of said banks as drawee, and that such officers alone had the authority to withdraw any money from said banks on behalf of plaintiff corporation by means of a check. All deposits of money of the plaintiff corporation were made with each of said banks only by said Officers, President and Secretary and Treasurer. Josephine Coffman had no authority to sign any checks on behalf of plaintiff.

"At the end of every month each of the banks made a bank statement showing all the deposits and all checks paid and charged to the bank account of Plaintiff and the balance of deposit remaining on hand. Said statement showed checks paid and charged in total sum of any day if more than one check was paid. However, the checks were listed and totaled on tapes attached to the bank statement. This bank statement together with all paid and cancelled checks charged against the bank account of plaintiff, at first for a short while was mailed by the bank to the plaintiff, and thereafter, they were delivered by the bank to said Josephine Coffman who called personally at the bank and received the same and took them to the office of the plaintiff. All of which was permitted by the plaintiff, and then it became the duty of Josephine Coffman to examine the same and to check and reconcile them with the books of the plaintiff.

"The books of the plaintiff consisted of a general journal in which were entered each day all transactions as they occurred, that is, entries of all receipts and disbursements were made thereon by Josephine Coffman daily. At the end of every month, the totals of the entries in this general journal were posted to a general ledger. There was some kind of a record of payroll checks bearing numbers different from general checks. There was a looseleaf check book with forms of three checks to a page and consecutively numbered, and opposite such forms of checks, stubs for purpose for entering amounts of checks and indicating for what check was for. All bills and expenses were paid only by check. The Plaintiff never had more than about $50.00 in cash in its office. All other money of the plaintiff was deposited in the bank. The plaintiff also owned and operated a subsidiary called "The South Side Builders Supply" by means of which it simply bought supplies and materials chiefly for plastering from Inland Steel Corporation at Cincinnati, Ohio, and then sold them for a higher price to certain parties. The record of the transactions of this subsidiary was kept by entering in the general journal entries of supplies purchased and sold as they may have occurred on any day.

"It was the duty of Josephine Coffman to keep all these books and make the necessary entries into them, and to make out all checks for bills to be paid, and to present them for signature of said Robert Juerling or Charles M. Brady and then mail or deliver the same to the payees. The fiscal year of the Plaintiff Corporation was fixed to end September 30, and tax returns were made thereafter in the month of November accordingly.

"Robert Juerling and Charles M. Brady were in charge of the office and supervised whatever was done in the office and, also, the conduct of Josephine Coffman. They also regarded her as a competent bookkeeper and clerk, had great confidence in her, trusted her implicitly, and in general let her take care of the business in the office. It seems she was well regarded and respected by everyone, including both defendant banks, and all had confidence in her ability and her integrity. At no time did the Plaintiff ever have its books audited by a qualified accountant or auditor. The only time it employed an accountant or auditor was in the month of November of every year for the purpose of making its tax returns. Throughout the years and until November, 1955, Bernard Massmann, as the accountant, made out the tax returns from the rec-

ords on the books of the corporation and saw nothing wrong until in the month of November, 1955, as is hereinafter stated.

"However, beginning January 2, 1951, and until January 28, 1955, during every month of the year except the months of September and October, Josephine Coffman forged from one to three checks a month drawn against The Second National Bank payable to herself in such amounts as $1,000.00; $850.00; $750.00; $500.00 so on down to $50.00 by forging the signatures of the President Robert Juerling, and in one instance the signature of one Charles M. Brady, and she endorsed these checks and cashed them at The Second National Bank at the windows of different tellers, and she took the money and appropriated it to her own use. These checks total in number eighty two, and are for the total amount of $67,058.23.

"To accomplish these forgeries without the knowledge of Mr. Juerling and Mr. Brady, she took a blank check out of the check book and held it up to the window in the office and traced on it the signature of Mr. Juerling, or Mr. Brady, over a check bearing their genuine signatures. She made the checks payable to herself but, in the corresponding check stub she falsely showed, by entry thereon, payment to some supplier of materials, chiefly, Inland Steel Company, and in the amount of the check, but for which sum there was in fact no invoice from the supplier, and also made corresponding enteries (sic) in the journal. Then in the hope of concealing her forgeries and deceiving Mr. Juerling and Mr. Brady, she always, when she arrived at the office with the bank statement and cancelled checks, promptly examined the statement and checks and took out the checks she had forged and threw the tapes as to the checks, into the wastebasket, then she assembled the checks in numerical order and laid them with the statement on the desk of Mr. Juerling or Mr. Brady for their inspection and examination. She took the forged checks home and burned them.

"Mr. Brady says that he simply checked the statements to see that the deposits were correct, relying on his memory for that, and he simply looked at the checks to see that they were checks for bills payable, relying on his memory for that, and at no time did he ask for the tapes or add up the checks to see whether they corresponded in total amount with the checks charged as paid in the statement. He did not look at the check stubs or any invoices. Plainly, had he called for the tapes or looked at

the check stubs, or had he added up the amount of the checks placed on his desk he would have discovered that checks were missing and the total amount of the checks was less than the amount charged in the statement. The difference could not be voided or outstanding checks, because statements showed that missing checks had been paid. Perhaps he assumed they were voided or outstanding checks. Very often Josephine Coffman made entries on the back of the bank statement listing checks not returned and further would show—

'Our bank Balance $————
Outstanding Checks $————
Banks Balance $————

Mr. Brady could see that there was something wrong as to the balance of deposit shown on the bank statement, and had he looked at the check stubs as to the missing checks he would have seen that the checks were made to parties for invoices that did not exist. Mr. Brady asked no questions, made no investigation, saw nothing wrong and just returned the bank statements and checks to Josephine Coffman who then filed them in the proper files for the month. Mr. Juerling hardly made any examination of the statements and checks, and in the main, left that matter to Mr. Brady and Josephine Coffman.

"This method of procedure in forgery, and examination of bank statements, and returned checks existed and continued throughout all the time the Plaintiff banked with the Second National Bank from January 2, 1951 to January 28, 1955, and the officers of Plaintiff did not discover any of the forgeries and made no complaint at any time to The Second National Bank as to their account. Then on January 28, 1955, the Plaintiff closed its account with The Second National Bank with a final statement of account, and took its business to and transferred its account to the First National Bank.

"Then while the Plaintiff banked at The First National Bank from January 28, 1955 to November 5, 1955, Josephine Coffman practiced the same method of procedure in forgery, and examination of monthly bank statements, and cancelled checks and concealment of her forgeries as she did when Plaintiff banked with The Second National Bank. Every month, except during the months of September and October, 1955, she forged from one to three checks drawn on The First National Bank, forging the signatures of Robert Juerling, making checks payable to herself for various amounts, but instead of endorsing and

cashing the same at The First National Bank, she endorsed and cashed them at the Second National Bank, which in turn forwarded them to The First National Bank for collection and were paid by the First National Bank and charged to the account of Plaintiff. These checks total in number twenty-six and are for the total sum of $12,-302.50. Neither Mr. Juerling or Mr. Brady ever discovered these forged checks by any examination they ever made of the monthly bank statements or otherwise. They approved all statements and saw nothing wrong.

"However, on November 17, 1955, when Mr. Bernard Massmann, the accountant, was checking the records of the Plaintiff to make out the annual tax return to the Federal Government for the fiscal year ending September 30, 1955, the accountant happened to remark to Mr. Brady that The South Side Builders Supplier account showed such a large loss. Mr. Brady replied that it could not be true because all the items received were always sold at a price higher than the invoice price. So they, even with the aid of Josephine Coffman, looked for the invoices but could not find a number of them and Josephine Coffman could not produce them particularly some from Inland Steel Company. Therefore, they obtained from Inland Steel Company a list of all invoices and found by comparison with the books of the Plaintiff that there were many more invoices shown on the books than was shown in the list of Inland Steel Company. Then on a mere hunch, they decided that Mr. Brady had better go to the First National Bank and see how the checking account stood. This, he and the son of Mr. Juerling did and found that the bank paid and cancelled checks dated in November payable to Josephine Coffman, one for the sum of $1,000.00 and two payroll checks for lesser amounts; the checks apparently being signed by Robert Juerling. Then these checks were shown to Mr. Robert Juerling and he said he did not sign them. He could not tell by mere inspection that the signatures were not his. To determine the forgery required the use of a magnifying glass. The next day the checks were shown to Josephine Coffman and she admitted that they were forged by her, and she also admitted that she had forged many more previous checks. Mr. William H. Reller was present as attorney and prepared a statement dated November 19, 1955, which Josephine Coffman signed. In it she tells about forging checks drawn on The Second National Bank as well as on The First National Bank. She could not remember the amount of her forgeries, but stated a probable sum of $20,000.00. That the most recent check was dated November

4, 1955, drawn against The First National Bank, and when she cashed it at The Second National Bank, she was paid in $50.00 bills and $10.00 bills. She signed a second statement dated November 23, 1955, and told more in detail how she committed the forgeries. The Plaintiff then ordered an audit of the books of the corporation for the years 1949 to, and including 1955, such audit was made and completed by April, 1956.

"On November 21, 1955, Plaintiff made a written agreement with Josephine Coffman, whereby she, in substance, acknowledged the forgeries and agreed to turn over to the Plaintiff all of her property and it was further agreed that others make contributions. This agreement was reduced to writing and signed by Plaintiff and Josephine Coffman. A supplementary agreement was written and designed by the parties, dated and signed December 21, 1955, whereby, it was agreed that Josephine Coffman was to deed to Plaintiff her residence property in Richmond, Indiana, and in consideration therefore, the Plaintiff was to release to Josephine Coffman a 1955 Nash Automobile. The formal demand for payment was made on The First National Bank by letter, dated April 30, 1956, demanding payment of $12,602.50 to cover checks forged from January 28, 1955 to November 5, 1955. This demand was signed by V. H. Juerling & Sons, Inc., by President Robert Juerling and Secretary and Treasurer Charles M. Brady. Thereafter, the bank denied liability. Demand was made on The Second National Bank by a letter dated May 21, 1956, signed by David W. Dennis, as attorney for V. H. Juerling & Sons, Inc. It demanded payment of checks drawn against The Second National Bank from January 3, 1951 to January 28, 1955, total $67,058.23, and also for checks drawn against The First National Bank from January 28, 1955 to November 5, 1955, and cashed at The Second National Bank by Josephine Coffman, total $12,302.50. The total demand is $79,360.73. Thereafter, The Second National Bank denied all liability. By reason of these forged checks, Josephine Coffman was charged by affidavit with the crime of forgery in the Wayne Circuit Court, and she plead guilty and was sentenced to The Indiana Women's Prison, Indianapolis, Indiana, where her deposition was taken on November 9, 1957.

"By reason of the forged checks Josephine Coffman reduced the profits of Plaintiff Corporation, and by reason thereof, the books of the company did not show much in the way of profit. Charles M. Brady knew that the corpora-

tion should have made a profit on some of its contracts and he wondered why the company did not achieve a larger profit, but he, at no time, made any investigation as to why the profits were low.

"In pursuance of the written agreement, Josephine Coffman did deed to Plaintiff her residence, and also turned over to the Plaintiff practically all her household goods and furniture in her residence, and certain articles of clothing and jewelry she had bought with funds derived from forged checks. This was done before demand was made upon the banks for payment of all the forged checks. Plaintiff admits it thus received $17,010.14 from Josephine Coffman."

After reviewing the pleadings and the depositions contained in the record now before us, we find that the foregoing facts found by the trial court are substantially correct and there was not a genuine issue of any material fact in controversy and the sole question remaining for the Court to determine was one of law under the existing facts.

In checking the law in our state applicable to the foregoing facts, we find the general rule applied in Indiana concerning the rights and liabilities between banks and depositors regarding forged checks was first decided in the case of *Neal v. First National Bank of Lebanon* (1901), 26 Ind. App. 503, at page 510, wherein this Court stated:

"The relation and relative obligations which arise between a bank and its depositing customers are in general simply those of debtor and creditor. The deposits are regarded as loans to the bank without interest, and the money goes into the general fund and is used by the bank for its own benefit in its usual financial operations. The bank thus gets the benefit of the loan of the depositor's money, and as a compensation to the depositor there is an implied obligation on the part of the bank to honor and pay on presentation the checks and drafts of the customer until his deposit is exhausted. The deposit creates a debt which is discharged *pro tanto* by the payment of the depositor's checks. See, *Boyden v. Bank*, 65 N. C. 13; *Himstedt v. German Bank*, 46 Ark. 536; *Perley v. Muskegon County*, 32 Mich. 132, 20 Am. Rep. 637; *McLain v. Wallace*, 103 Ind. 562.

"The rule of law that a bank is presumed to know the signatures of its depositors and that it pays forged checks at its peril is too well settled to need the citation of authorities to sustain it. But if the depositor's attention is called to the forgery and he fails to complain, and acquiesces in the action of the bank, he, to all intents and purposes, makes the forger his agent, and relieves the bank from liability as to all amounts paid out after the attention of the depositor had been called to the action of the bank. The reason of this rule is that the depositor owes some duty as such to the bank. If his laches or negligence is the cause of the bank paying a check out of his account which it would not have paid had it been in possession of the facts known to him and of which he negligently omitted to put it in possession, the loss then must fall upon the depositor.

"*First Nat. Bank v. Allen,* 100 A.a. 476, 14 South 335, 27 L. R. A. 426, 46 Am. St. 80, was an action against a bank to recover a deposit. The money had been paid out upon forged checks signed by the depositor's clerk. The forgeries covered a period of six months. The depositor was furnished each month with a statement of his account and all the checks which had been paid were returned to him with the statement. It was therein held that the bank was only liable to the depositor for the payments made before the furnishing of the first monthly statement.

"In *Bank v. Morgan,* 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811, it is held that the pass-book of a depositor balanced at intervals by the bank and returned to him is only an account stated, and is not conclusive; but that where he omits to examine the charges therein, and canceled checks returned as vouchers with the pass-book, and by so doing fails to discover that the amounts of a number of checks have been raised by his clerk to whose care he has entrusted his account with the bank, and he is thus enabled to give timely notice of the frauds to the bank, he is guilty of such negligence, that, in an action by him to recover the amounts paid upon the altered checks, it is error for the court to direct a verdict in his favor.

"Much stronger facts are presented in the case at bar. Here the checks and pass-book were examined by appellant, or at least the fact that the forgeries had been committed was brought to his attention; yet he wholly failed to notify appellee of such facts, and by so doing he in fact acquiesced in appellant's action in paying the checks.

"In *Wind v. Fifth Nat. Bank*, 39 Mo. App. 72, it was held that where checks of a depositor on a bank are paid by the bank on forged indorsement of the payees, if the depositor, when his bank book is returned to him balanced with the canceled checks as vouchers, having knowledge of the circumstances from which by reasonable inquiry he could discover the forgeries, fails to exercise such reasonable care and inquiry, and the bank thereby suffers loss or is placed in a worse position than if such inquiry had been made and the facts ascertained and communicated to it within a reasonable time, the depositor loses his recourse against the bank.

"In *Weinstein v. National Bank*, 69 Tex. 38, 6 S. W. 171, 5 Am. St. 23, it was held in an action against a bank to recover money on forged checks, that the instruction was not misleading which charged that the bank would be liable unless plaintiff had neglected to examine his account and report the forgeries for such a length of time as worked an injury to the bank; that the bank was injured if by reason of plaintiff's negligence it lost the means of recovering the money which it would have had if notified within a reasonable time, and that if by reason of plaintiff's delay the opportunity of protection is lost, plaintiff would not be entitled to recover. See, also, Morse on Banks and Banking, § 472."

This Court considered a similar question in the case of *Indiana Bank and Trust Co. v. Lincoln National Bank and Trust Co.* (1965), 137 Ind. App. 546, 206 N. E. 2d, 879, wherein the drawee bank brought an action against the cashing bank to recover amounts paid by drawee bank on checks which the cashing bank had cashed and which bore forged endorsements of payees. The Court on page 885, quoting from other decisions, sets out the general rule as to what is required of a depositor in the following language:

" 'The law requires a depositor, upon the balancing of his account and return of his canceled checks, to exercise reasonable care in examining the accounts and checks, to know whether or not the balance shown to his credit is correct. And the depositor is charged with whatever knowledge he would have acquired by making such an examination in a reasonably careful manner. *First National Bank (of Philadelphia) v.*

*Farrell* (C. C. A. [1921] 272 Fed. 371, 16 A. L. R. 651 (certiorari denied) 257 U. S. 634, 42 S. Ct. 48, 66 L. Ed. 408; *Leathers Mfrs. N. Bank v. Morgan* (1885), 117 U. S. 96, 6 Sup. Ct. 657, 20 L. Ed. 811; *National Dredging Co. v. President of Farmers' Bank* (1908) (6 Pennewill) 580, 22 Del 580, 69 Atl. 609 (607) 16 L. R. A. (N. S.) 593, 130 Am. St. 158 . . . *Fletcher, etc., Bank v. Crescent Paper Co., Supra*, page 342 of 193 Ind., 139 N. E. at page 668."

See also: 10 Am. Jur., 2nd, Sec. 511, p. 478; Sec. 603, page 568. For the general rule as to the duties of a depositor, see 9 C. J. S., *Banks and Banking* Sec. 356 (d) page 743.

The record in this case shows that the Appellant did not examine its checks to determine whether the balance was correct, or whether all the canceled checks were present, or whether any of the canceled checks were forged. Therefore, we must hold as a matter of law, that by the failure of the appellant to make such an examination of the bank statements every month, the appellant was guilty of such negligence as to amount to a ratification of the banks' actions in paying the forged checks and to preclude the appellant's recovery from the banks. We think the cases clearly hold the depositor liable for his failure to examine the statements furnished to him by the bank, so that if he fails to make such an examination within a reasonable time, and fails to notify the bank of any irregularities he then acquieses in the bank's conduct and confirms its action.

Turning now to the matter of election of remedies by the plaintiff-appellant, the record discloses that the appellant entered into a written agreement with Josephine Coffman whereby she and others agreed to deliver to the appellant certain properties toward restitution of monies fraudulently obtained by her from forging appellant's checks. Pursuant to said agreement, Josephine Coffman deeded to the plaintiff-appellant her residence, and turned over to the plaintiff certain other personal property exceeding in value the sum of $17,000.00. This was done before demand was made upon the banks by the plaintiff for payment of the checks cashed by

the banks. Thereafter, the banks denied liability and these lawsuits were commenced. In the answers filed by the defendant banks, each bank sets up the defenses of denial, payment, damages suffered by the bank, estoppel, account stated and election of remedies.

We have searched the case law of Indiana for a case having a similar fact situation and find none exactly like this case. In looking to other jurisdictions for guidance, we find that the authorities do not agree. Some courts hold that where there are two or more remedies open to a plaintiff and he chooses one, he may not thereafter abandon that choice and choose another. Thus, some of the courts have held in cases similar to this one that if the plaintiff sues the receiver of the money, he precludes himself from seeking a remedy against the bank. Other courts have held just the opposite, that the act of the depositor in seeking restitution from the person who received the money did not amount to such an election as would foreclose his right to sue the bank.

We have studied the Indiana cases dealing with election of remedies and find only a few cases relevant to the fact situation in this case. In the case of *Nysewander v. Lowman* (1890), 124 Ind. 584, 24 N. E. 355, the court held that the mere bringing of an action is not such an election as will bar another action.

In the case of *Cohoon v. Fisher* (1896), 146 Ind. 583, 44 N. E. 664, the court stated:

"Such an election, to be a bar must have been prosecuted to judgment."

The court further stated:

"To the same effect are all the other cases, namely, the prosecution of one remedy must either be pending or have been prosecuted to final determination to bar or exclude another concurrent remedy for the same right."

In the case of *National Hame & Chain Co. v. Robertson* (1928), 90 Ind. App. 556, 161 N. E. 851, the Court stated:

"A choice of remedies is not binding on a party plaintiff unless the remedy chosen has been prosecuted to a conclusion."

At first blush, these cases seem to sustain the position of the appellant that it is not estopped from suing the defendant banks because it had previously elected to pursue the remedy of entering into an agreement with Josephine Coffman for the repayment of monies. However, in none of the above cited Indiana cases was there a situation like the one in this case where the plaintiff had received a benefit as the direct result of a choice of one remedy before he commenced another remedy.

In this case, Josephine Coffman voluntarily entered into an agreement with the plaintiff-appellant pursuant to which the plaintiff received a benefit in excess of $17,000.00. Because Mrs. Coffman did this pursuant to an agreement, the plaintiff was not required to prosecute to judgment a civil action against her for recovery of monies. Therefore, we believe the fact that the plaintiff herein derived a substantial benefit from its election to recover from Mrs. Coffman before it pursued another remedy against the banks, distinguishes this case sufficiently from the Indiana cases above cited to make those cases inapplicable to this case.

As heretofore stated, in making a search of the case law of Indiana, we do not find any case having a similar fact situation involving the question of election of remedies where the plaintiff has gained a benefit from the choice of one remedy before he chooses another. We have, therefore, made a search of the law of other states.

In Vol. 9, C. J. S., *Banks and Banking*, § 356, p. 752, we find the following:

"Election of remedies. A plaintiff who sues a drawee bank on a check paid by it on a forged endorsement takes the position that the bank still has his money, that the money paid out by the bank was the bank's money, and that such payment was not binding on plaintiff; and, where he sues another who has indorsed such check over to the drawee bank, he necessarily takes the position that the money paid by the drawee bank was wrongfully paid, and, therefore, wrongfully detained. Such positions are mutually contradictory, and in choosing his remedies plaintiff cannot adopt both positions."

In 10 Am. Jur., 2nd, *Banks*, § 508, pp. 476-477, we find the following:

"§ 508. Effect of, and remedies for, unauthorized payment or nonpayment; election.

"As a general rule, a depositor's funds in a bank are unaffected by any unauthorized payment. A person entitled to a bank deposit which has been paid to another person without authority has a right of action against the latter for the deposit. A number of cases have held that the depositor has an election to sue either the bank or the receiver of the money, but that if he chooses to sue the latter he thereby precludes himself from suing the bank. Indeed, it has been held that a depositor, by obtaining judgment against either the recipient or the bank, loses his right against the other even though the judgment maybe uncollectible. Other cases have held, however, that the act of the depositor in seeking restitution from the receiver of the money did not amount to such an election as to preclude an action against the bank. Bringing and then discontinuing an action against the recipient have been held not to preclude an action against the bank."

We are of the opinion that of the two positions set forth in § 508 quoted above, the former position is the sounder, particularly where it appears that the plaintiff has received a benefit from his election.

In a Michigan case, *National Production Co. v. Guardian National Bank* (1937), (Michigan), 274 N. E. 774, the plaintiff sued the bank in assumpsit, demanding the sum of

$100,000.00 by reason of monies paid out on forged endorsements on checks forged by one Quart, agent of the plaintiff. The Court, on page 775 states:

> "In the disposition of this case, we may concede that Quart wrongfully indorsed the checks in question belonging to the plaintiff and misappropriated as a part of the proceeds thereof, and that the bank was negligent in cashing such checks under the circumstances and was liable for the proceeds thereof. Still, plaintiff cannot recover, and equitably ought not to recover. The checks were cashed in 1928 and 1929. In 1930 an audit of the books of the National Production Company was had and the alleged misappropriations of Quart discovered. Had the bank been properly notified that plaintiff intended to seek to hold it liable, it might have saved itself from serious loss. But the bank was not notified until 1932 and in the meantime plaintiff had recovered from Quart a large amount of property and Quart had, by surrendering such property to the plaintiff, thereby rendered himself financially irresponsible. Notice to the bank must have been given without unreasonable delay after knowledge of Quart's defalcations. This was not done. Plaintiff could have spoken, it was its duty to speak, and it failed to speak. Plaintiff endeavored to collect, and did collect, from Quart a considerable portion of the amount claimed by plaintiff to have been misappropriated by him. As said in *Brown v. People's National Bank,* 170 Mich. 416, 136 N. W. 506, 509, 40 L. R. A. (N. S.) 657: 'We are agreed that an equitable estoppel arises in this case by reason of plaintiff's failure to give notice of the fraud to defendant within a reasonable time after it was known to her, or to her authorized agent; and therefore the loss must remain where the chance of business has placed it.' "

In the case of *Midland Savings & Loan Company v. Tradesmen's National Bank,* 57 F. 2d 686, one Dewberry forged indorsements of the payees on checks of plaintiff and obtained from the defendant bank money by cashing the checks at drawee bank. The plaintiff sued the bank for amounts so paid out. The court on page 693 states:

> "It appears, however, that as to certain of the checks the Midland Company pursued Dewberry either by making a claim against his estate or accepting relief as against

Dewberry and his estate. If this was done subsequent to the time the plaintiff acquired actual knowledge, as distinguished from suspicion, that Dewberry had forged the indorsements, or if the relief asked for or accepted was grounded upon the fact of his forgery, then under the rule laid down, *supra,* it elected to treat the entire proceeds of such checks as lawfully coming into his possession, and thereby ratified the act of the bank in paying out its money."

In this case, we have much the same situation, where the appellant, subsequent to the time it obtained actual knowledge that Josephine Coffman had forged its checks, ██ obtained from her by way of restitution, real estate, certain personal property, and promises of further monies. We are of the opinion that such actions ratified the action of the defendant banks in paying money to her. We are further of the opinion that the appellant, having chosen to proceed against Josephine Coffman, and having received partial restitution from her, made its election of remedies, and having benefited from its election, it is now estopped from pursuing another remedy.

For all of the above and foregoing reasons, we are of the opinion that the trial court was correct in sustaining the motions for summary judgment, and that the judgment should be affirmed.

Judgment affirmed.

Carson, C.J., concurs, Prime, J., concurs in result.

Faulconer, J., dissents without opinion.

NOTE.—Reported in 242 N. E. 2d 111.