Richard Warren NORTH, Northwestern Farms, Inc., and Northwestern Feed and Grain, Inc., Defendants-Appellants,

v.

Russell K. NEWLIN, Plaintiff-Appellee.

No. 3–1079A292.

Court of Appeals of Indiana, Fourth District.

Feb. 4, 1981.

Rehearing Denied March 24, 1981.

Alan H. Lobley, Richard A. Bierly, Ice, Miller, Donadio & Ryan, Indianapolis, Pearlman & Chosnek, Lafayette, Barce, Vann & Ryan, Fowler, for defendants-appellants.

William S. Spangler, Sr., Spangler, Jennings, Spangler & Dougherty, P.C., Merrillville, Stephen C. Bower, Bower & Bower, Kentland, for plaintiff-appellee.

MILLER, Judge.

The instant litigation involves an action for specific performance of a land purchase contract by appellee Russell K. Newlin against the sellers, appellant Richard Warren North and co-appellants Northwestern Farms, Inc. and Northwestern Feed & Grain, Inc., of which North is president and sole stockholder. Pursuant to Newlin's amended complaint for specific performance and compensatory and punitive damages, the trial court ordered North and the other appellants to convey to Newlin some 1,492 acres of farm land plus a grain elevator located in White County for a price of

$4.5 million. North argues on appeal that no contract for sale of the land was ever formed and that in any event specific performance was an inappropriate remedy since Newlin's earnest money deposit was refunded and the land in question has been sold on conditional contract to a third party, the David R. Webb Co., Inc., which had no notice of Newlin's claim when its offer to buy was accepted, and which was not joined as a party to the present law suit.[1]

We affirm.

## FACTS

Attached to Newlin's amended complaint was a copy of a written offer to purchase the property in question, signed by Newlin, and prepared by the sellers which offer the parties do not dispute was presented by Newlin on October 7, 1976 to one Morris Skiles, a Lafayette real estate broker acting for North, and to whom Newlin had submitted two previous offers (also prepared by Skiles himself) which were rejected. At that time Newlin gave Skiles a $100,000 "earnest money deposit" described in the written offer, as quoted *infra*. By way of background to the essential issues of this appeal, the relevant terms of the original Newlin offer were as follows:

"Purchaser agrees to pay for said property the sum of $4,200,000.00 upon the following terms: $100,000.00 cash herewith to be held in escrow by you pending acceptance of this offer and consummation of this transaction, and the balance of the purchase price will be paid according to the terms and conditions specified in a contract for the Conditional Sale of Real Estate agreement by and between Seller and Purchaser to be executed at the time of closing of this transaction; the terms

and conditions shall provide for the following: (1) Purchaser agrees to pay 20% of the total purchase price, in cash, or cashier's check, at the time of the execution of a Contract for the Conditional Sale of Real Estate agreement, of which the 'earnest money' deposit shall be a part; (2) the remainder of the purchase price shall be paid as follows: payments of principal and interest shall be paid semi-annually, (based on the amounts of principal and interest stated for a 30 year amortization period); interest shall accrue on the unpaid principal balance at the rate of 7% per annum, the payments shall become due and payable on March 1, 1977, and September 1, 1977 and each March 1st and September 1st of each consecutive year thereafter until 20 such payments have been made; on March 1, 1987 the principal balance then remaining shall become due and payable along with all interest accrued thereon.

. . . . .

A 'Conditional Sale of Real Estate Agreement' shall be entered into between the Sellers and Purchasers for the sale and purchase of this real estate according to the terms herein set forth on or before December 1, 1976, which date is referred to herein as the 'time of closing'.

. . . . .

This offer is open for acceptance until October 9, 1976, and if not accepted in writing by that time the cash deposit (earnest money) herein made is to be returned to Purchaser and this offer is terminated."[2]

It is further undisputed by the parties that such offer was never accepted by

---

1. It is noted in this regard that the trial court denied a "motion to intervene" filed by such third party, for the reason that the motion was not timely filed. The company's petition was filed March 30, 1979, thus subsequent to the original judgment of January 29, 1979 (an amended judgment, omitting an earlier damage award, was entered July 27, 1979). It does not appear the appellants ever sought to dismiss Newlin's complaint for failure to join a party needed for just adjudication pursuant to Ind.

Rules of Procedures, Trial Rules 12(B)(7) and 19, nor did they raise impossibility of performance in their answer, which consisted only of a general denial.

2. The offer also provided, with exceptions, that as regards assignment of the contract, the seller's reasonable approval would be required before the purchaser could transfer his interest in the conditional sales contract or the real estate during the term of the agreement.

North, but that on October 8, North did sign the same piece of paper after directing Skiles to change the price and interest terms to $4.5 million and 8%, which changes were initialed by North before returning the document (now a counteroffer) to Skiles. As found by the trial court, this counteroffer was also apparently signed by Louis Pearlman, Jr., secretary of Northwestern Farms, Inc.

There is conflicting evidence regarding the subsequent conversations between Newlin and Skiles, and an alleged oral acceptance of North's counteroffer by Newlin. However, the evidence tending to support the trial court's judgment, consisting mainly of Newlin's own testimony regarding conversations with Skiles, may be summarized as follows: On October 8, sometime after North initialed his counteroffer and returned it to Skiles, Skiles telephoned Newlin and there was a conversation which Newlin summarized as follows:

"A. Mr. Skiles called me and he said that, 'I had taken the document or the offer,' that I had signed, to Mr. North, and he had signed the offer, with a change in the purchase price and the interest rate, and he then said, 'I took it down to Mr. Pearlman, and Mr. Pearlman signed the document,' and he said to me, he said, *'Are you willing to accept those changes in that offer?' And I said to him, 'If that's what it takes to buy it, we will accept it.'* And he said to me, 'Do you want me to come to your home this afternoon and bring that document and have you initial those changes that Mr. North and Mr. Pearlman had initialed? And I said, 'I'm, at the present, getting ready to come to Lafayette.' I said, 'I don't think there is any point in you driving down here. I will come to Lafayette to get some parts, and I will see you later this evening and finish whatever business we have to do.' " (Emphasis added.)

Newlin did not initial the document that afternoon but instead went to Chalmers, Indiana, where he discussed with Larry Keesling, a farmer and realtor, the possibility that Keesling would buy a grain elevator and some of the land on the North farm if Newlin acquired the property.[3] While at Keesling's, however, Newlin did call Skiles (with Keesling on an extension telephone) and had a conversation which Newlin recounted at trial as follows:

"A. ... I called Mr. Skiles and told him that I was at Larry Keisling's [sic] and I said, 'Do you want me to come to your home as soon as I leave here, and pick up the document and put the initials on it?' He said, *'That is not necessary, because,'* he said, *'you can do that in the morning.'* He said, 'At this time,' he said, *'I have the document and in the morning,'* he said, *'we want to finalize everything, the land Contract, and wind this all up by noon.'* He said, 'I don't think we should linger too long.' " (Emphasis added.)

Similarly, Keesling's notes of that conversation, which were introduced as Defendant's Exhibit 5, revealed that Newlin had called Skiles that evening and that Newlin "told Morris Skiles he would talk to Warren North and would pay $4,500,000 at 8% interest and would be in touch with Morris after conversation with Warren" and that "Morris Skiles said nothing else could be done until Saturday morning, October 8, 1976 [sic]."[4] His notes also reflect that Skiles told Newlin he "had until noon Saturday to get *details* worked out." (Emphasis added.) The same evening that Newlin called Skiles, and according to Keesling's notes about half an hour later, Keesling telephoned North himself, with Newlin on the line, to discuss

---

**3.** In this regard, Keesling testified North had earlier urged Newlin and Keesling to "get together and try to make me an offer," and Newlin stated he previously had discussed with both Keesling and North the possibility that Keesling would buy the grain elevator, apparently because North's approval was required under the written offer made by Newlin if Newlin wanted to transfer part of the property during the contract period.

**4.** It appears Saturday was actually October 9.

the transaction, and was told by North the latter was too tired to talk that night but that the matter could be discussed the next morning, namely, Saturday, October 9. In this regard, Skiles confirmed that North had requested Skiles, and his attorney, Pearlman, to be present at a meeting Saturday morning with both Keesling and Newlin.

Newlin's wife testified that on Saturday morning, Skiles called her to say her signature would be required when the deal was "finalized" that morning, although Skiles, who stated he remembered calling her, asserted he couldn't recall whether or not her signature had been discussed. When Newlin, Keesling, and attorney Ralph Bower went to North's residence that morning, however, North was not at home and Newlin was informed by North's housekeeper they were at Pearlman's office in Lafayette. When Keesling called that office, Pearlman told Newlin and Keesling the farm had already been sold. Skiles stated by affidavit he had attempted to contact Newlin the previous night to inform him the meeting with North had been moved to Pearlman's office, but that he could not reach Newlin, apparently because the latter was then at Keesling's, where he spent the night. According to North, he agreed to meet with Newlin on Saturday morning only "to be courteous," since he had decided to accept the Webb Company offer.

Newlin testified that after he, Keesling and Bower ultimately proceeded to Pearlman's office on Saturday morning, Skiles reiterated that the farm had already been sold, and when Newlin asked to have his "contract" back, Skiles told him, "Mr. North and Mr. Pearlman never signed the Contract ... you never seen it, did you?" Pearlman then handed Newlin the docu-

ment, which had Newlin's signature on it, but from which the half page reserved for the seller's signature had been removed. Newlin stated Pearlman told him he had torn off this part of the document because he had "doodled on it." In addition, two notations—presumably North's initials and the changes he made in the purchase price and interest rate—had been marked out with ink, and at the top of the document appeared the handwritten word "Rejected," North's and Pearlman's initials, and the date 10–8–76, although it is conceded these latter notations were actually made on the morning of October 9. Thereafter, Newlin asked for and received back his $100,000 deposit, and, according to Keesling's notes, then said "you guys accepted the offer to purchase and we've bought [the] farm and if you don't think we have, there will be a lawsuit."

As noted above, the revised judgment of the trial court [5] on July 27, 1979, following a trial to the court, awarded Newlin specific performance of the land contract, subject to North's changes in purchase price and interest rate, and on the same date that court denied the petition of the Webb Company to intervene for the reason that it was not timely filed.[6]

Pursuant to the instant appeal, the trial court further granted a stay of its judgment, upon defendant's motion under Ind. Rules of Procedure, T.R. 62(B) and (C), "for the reason that irreparable injury would result therefrom for the reasons set forth in the Motion to Correct Errors." The Memorandum accompanying the Motion to Correct Errors asserted the Webb Company was the equitable owner of the property pursuant to performance under its accepted offer and resulting contract. It was stipulated at trial there was a signed agreement

---

**5.** The court initially awarded Newlin $388,-120.00 damages in addition to specific performance, apparently basing such damages (as alleged in Newlin's amended complaint) on the rental value of the property had the contract been performed, but that judgment was withdrawn following North's Motion to Correct Errors.

**6.** The Webb Company did not perfect any appeal from this ruling, although an appeal from such a determination is afforded pursuant to the appropriate rule then in effect, Ind. Rules of Procedure, T.R. 24(C) which provides in part that "[i]ntervention after ... judgment for purposes of ... an appeal may be allowed upon motion." *See Cuthill v. Ortmann-Miller Machine Co.,* (7th Cir. 1954) 216 F.2d 336.

to purchase between Webb Company and the original defendants in existence on November 1, 1976, but that no contract was recorded as of that date, and also that no *lis pendens* notice had been recorded in the county where the land is located.

## ISSUES

There are only two issues involved in this appeal, namely 1) whether a contract was ever formed, since North allegedly revoked his counteroffer; and 2) whether specific performance was properly or equitably awarded since Newlin allegedly was aware the defendants had entered into a binding commitment with the Webb Company prior to commencement of this action but failed to file a *lis pendens* notice or join that Company as a party, and since the Webb Company was the equitable owner of the property when the judgment was entered.

## I.

### *Whether A Contract Was Created*

■ There appears to have been sufficient evidence for the trial court to properly conclude Newlin accepted North's counteroffer and that a contract was thus formed.

North and the other appellants argue, in essence, that Skiles told Newlin he (and perhaps Newlin's wife) must sign or initial [7] North's counteroffer in order to accept it and that Newlin failed to take such action before North properly revoked it. They further maintain that such specified means of acceptance was not waived when Skiles told Newlin he could sign on Saturday morning, but rather that such statement was merely a promise to keep the offer open which was unsupported by consideration, and therefore unenforceable. In presenting their argument, the appellants quote the following language from 1 A. Corbin, Contracts § 39 (1963) at 163:

"An offeror has full power over the terms of his offer. He can create in the offeree a power of acceptance that is as limited, or as difficult of exercise as he pleases; and he can reserve in himself a power of revocation to be exercised in any way that he sees fit. *In order to do this, all that is necessary is that the offeree shall be informed of the limitation, or of the reservation, at any time before the offer is accepted.*" (Emphasis added.)

Even assuming the accuracy of such rule of law regarding acceptance and revocation, however, it is evident the trial court could reasonably have viewed the conflicting evidence in a manner different from that urged by North and the appellants. Initially, it is not clear that any precise means of acceptance was in fact ever communicated to Newlin, whether before his acceptance or after. North merely argues (without citing authority) that the "simultaneous" communication of an offer and a "specified mode of acceptance" *requires* acceptance in such manner, and thus that Newlin was required to sign or initial the counteroffer because Skiles told him on the telephone he was "*ready* to bring it down for his signature and for his wife's signature, if he were ready to go ahead and accept the changes." (Emphasis added.) It is not clear such statement "prescribes" a mode of acceptance, as contended. Moreover, such statement by Skiles was not made until after he had asked Newlin whether he would accept the changes and the latter had responded, "we will accept it." Thus, it does not appear any restriction was placed on the manner of acceptance before acceptance in fact occurred.

Similarly, North's argument in this regard is not significantly buttressed by Newlin's own testimony, also cited by the appellants, that the document "had to have . . . [Newlin's] initials on it," since such requirement may reasonably have been intended as

---

7. In contending there was a "prescribed" mode of acceptance, the appellants rely on the testimony of both Skiles and Newlin himself, although such testimony appears inconsistent in that Skiles suggested there was a requirement Newlin and his wife must sign the counteroffer, while Newlin suggested only that *his initials* were required at some point on North's handwritten changes. In their brief, the appellants conclude that initials on the changes were necessary for a valid acceptance.

a memorial that Newlin had agreed to the obvious handwritten changes, rather than a prerequisite to his valid acceptance of the offer. The record shows Bower, the attorney for Keesling who testified as to what Newlin told him about the deal, stated only that "there was something about initialing on the original offer and that it was still go, that instead of coming in that evening, he didn't need to go, and that he could come in the following morning" and that "[t]here was some discussion about his wife's signature, that she *was going to be needed when the formal Contract was prepared*, that she would have to sign it." (Emphasis added.)

In this regard, it is instructive to note the general rule that "the mere fact that parties who orally assent to all the terms of a contract refer to a future contract in writing does not negative the existence of a present and completed oral contract," 6 I.L.E. *Contracts* § 51 at 109, (1958) *citing International Shoe Co. v. Lacy*, (1944) 114 Ind.App. 641, 53 N.E.2d 636, *opinion supplemented*, 116 Ind.App. 78, 61 N.E.2d 85; *Horner v. Daily*, (1922) 77 Ind.App. 378, 133 N.E. 585; and *Featherstone Foundry & Machine Co. v. Criswell*, (1905) 36 Ind.App. 681, 75 N.E. 30. Moreover, it is clear that "the intention to make a legal obligation is not necessary for the existence of a contract," *State ex rel. Appleman v. Lake Circuit Court*, (1952) 231 Ind. 378, 382–83, 108 N.E.2d 898, 900, *quoting* 1 Williston, Contracts (rev. ed.) § 28 at 61, and that:

> "It is not the law of this state that an offeree's acceptance must be filed or delivered to the offeror before a contract is created. The acceptance must be evidenced by some overt act and must be communicated to the offeror so that there is a meeting of the parties' minds. 6 I.L.E., *Contracts* §§ 21, 23, 26 (1958). The acceptance may be expressed verbal-

ly, in writing, or by acts which manifest the acceptance. *Equitable Life Assurance Society of the United States v. Perkins* (1907), 41 Ind.App. 183, 80 N.E. 682."

*Young v. Bryan*, (1977) Ind.App., 368 N.E.2d 1, 3, *on remand*, 368 N.E.2d 3 (acceptance of offer so as to create a contract in an action for specific performance of an agreement to sell a farm may be oral, and need not be filed or delivered to offeror.)[8] As noted above, in the instant action Newlin stated he told Skiles "[i]f that's what it takes to buy it, we will accept it" and Keesling's notes of the later conversation corroborated that Newlin "told Morris Skiles he would talk to Warren North and would pay $4,500,000 at 8% interest and would be in touch with Morris after conversation with Warren" and that Skiles "said nothing else could be done until Saturday morning."

Finally, although North and the other appellants raise the further argument there was no "meeting of the minds" necessary to create a contract because "[t]he involvement of Keesling was not contemplated by the counter-offer," we conclude such contention (the precise nature of which is unclear) is without merit. The appellants empowered Newlin to accept the counteroffer, and he did. By the terms of such counteroffer, Newlin was authorized to transfer parts of the farm with North's approval, and the evidence shows not only that North was aware of Keesling's interest in the farm but also that, after the acceptance, Newlin and Keesling arranged to meet with North when the deal was finalized. That Newlin undertook before his acceptance, to discuss such a transfer with Keesling should not in any way affect his acceptance of North's counteroffer. The evidence does not suggest, much less require the trial

---

8. Additionally, it is undisputed that under Indiana law, the requirements of an original offer regarding the manner of acceptance, such as the specification of an acceptance in writing expressed in Newlin's original offer, are not "carried forward" into counteroffers so as to require an acceptance of the counteroffer in such manner. *Foltz v. Evans*, (1943) 113 Ind. App. 596, 49 N.E.2d 358.

The appellants similarly do not raise the Statute of Frauds as a defense to Newlin's oral acceptance, presumably because there was a writing, signed by North and Pearlman, which sufficiently identified the parties to the contract and the terms of their agreement. *See Foltz v. Evans, supra,* and *Young v. Bryan, supra.*

court to conclude, that any of the parties anticipated Keesling would actually be a party to the contract, although it is true his negotiations with Newlin suggested Keesling would give Newlin a percentage of the total purchase price in return for his share. In this regard, the argument in the instant case may be distinguished from the reasoning in *Gates v. Petri*, (1957) 127 Ind.App. 670, 143 N.E.2d 293, in which case there was a signed acceptance of an offer by only the seller-husband, although the offer was directed to the "owner" of certain property which in fact was held by the husband and his wife as tenants by the entireties. In that case, the Court concluded there was evidence to support the verdict that no acceptance was effectuated. By contrast, as noted above, the court in the instant case could reasonably have determined Newlin did accept the counteroffer and that Keesling's "involvement" was not legally significant, as regards formation of a contract.[9] Accordingly, all of the elements of a valid contract were present.

## II.

### Specific Performance

The additional argument made by North and the other appellants is that the award of specific performance was inappropriate under the circumstances. In this regard they argue 1) that it was inequitable to give Newlin specific performance in the absence of the Webb Company as a party to the litigation, since return of his $100,000 earnest money returned him to a position of "status quo," while the new purchaser of the land has made substantial payments thereon before notice of Newlin's claim; and 2) that in any event, Newlin waived any claim to specific performance by demanding return of his $100,000.

9. Nor was it essential, as contended by the appellants, that Newlin assent to the "essential term" of a prescribed "mode of acceptance" since, as noted above, it does not appear there necessarily was any such mode of acceptance, and in any event Skiles told Newlin his initials or signature were not necessary until Saturday morning.

Was Specific Performance "Inequitable"?

North and the other appellant's contention that the award of specific performance was inequitable draws considerable support from their representation, though it is not supported by specific evidence in the record, that the ultimate purchaser of the property, namely, the Webb Company, has made substantial payments thereon pursuant to a conditional sales contract, and that such company is in fact the equitable owner of the farm and has been in possession of it since December of 1976. In this regard, they apparently argue that the trial court abused its discretion by awarding specific performance, since it is settled law that the grant or denial of such relief rests within the sound discretion of that body. *Gyr v. Hagemann*, (1960) 130 Ind.App. 212, 163 N.E.2d 620.

It is apparent appellants have the burden of demonstrating the trial court's judgment was inequitable based on the facts in the record, and in this regard we note the appellants conceded at oral argument any defense of "impossibility" of performance in the absence of the Webb Company is an affirmative defense which they were required to establish.[10] *See Indianapolis Northern Traction Co. v. Essington*, (1913) 54 Ind.App. 286, 300–01, 100 N.E. 765, 765–66, (On Petition for Rehearing) where the Court stated:

"The Courts of this state have never directly decided that the burden is on the plaintiff, in a suit for specific performance of a contract, to allege and prove that the contract sought to be enforced is fair and equitable, or that it was supported by an adequate consideration, or that it was capable of performance, or to negative any other equitable defense; and we believe that the reverse of this proposition is the correct rule.

10. Such defense was not raised in an answer pursuant to Ind. Rules of Procedure, Trial Rule 8(c), although it is contended the pleadings should be amended under Ind. Rules of Procedure, T.R. 15(B) to conform to the evidence presented at trial, an argument which we consider, *infra*.

If the contract sought to be enforced, as disclosed by the complaint is clearly unfair and inequitable, or if the complaint, by its affirmative averments, discloses any other equitable defense, it will be subject to a demurrer for that reason. On the other hand, if the contract on its face is not inequitable, and if the averments of the complaint do not disclose an equitable defense, *the court will not presume, as against the plaintiff, either that the contract is inequitable, or that an equitable defense exists. If a defendant seeks to show that a contract is unfair or inequitable by reason of extrinsic facts not disclosed by the contract itself, he must allege and prove such facts as a defense.*" (Emphasis added.)

*See generally, Louisville, New Albany & Chicago Railway Co. v. Bodenschatz Stone Co.,* (1895) 141 Ind. 251, 262–63, 39 N.E. 703, 707. With such burden in mind, it is significant that in the instant case, the appellants failed to prove the performance was inequitable or impossible in the absence of the Webb Company as a party, in that the only evidence presented on this question to which they allude did not establish the full terms of any existing agreement between appellants and the Webb Company at the time of trial. Instead, the only evidence presented consisted of the Webb Company's accepted *offer* to purchase, dated October 8, 1976, which North stated was signed October 9, the unelaborated testimony of Skiles that with respect to such offer a transaction had been "carried out" and the offer "con-

summated," and Keesling's notes of a conversation with North after October 9 in which North acknowledged the farm had been sold to Webb and that a closing was set for "sometime the first of December." In other words, the appellants failed to submit to the trial court any specific evidence not only of performance under such contract and the exact nature of the terms established at the closing, including any provisions not mentioned in the offer then in evidence, apart from the vague assertion that the transaction had been "carried out," but in fact failed to introduce into evidence the parties' present agreement itself, or any specific evidence as to when the closing in fact took place and whether an abstract of title was provided by the sellers showing the interest claimed by Newlin, although the offer submitted into evidence recited that a contract of sale would be entered into between the parties on or before December 1, and that at such time the seller would provide an appropriate abstract of title [11] to the Webb Company. Based on such lack of evidentiary showing, we believe the trial court could only speculate whether, as alleged by the appellants, it would be inequitable to award specific performance of the contract to Newlin in the absence of Webb, since the parties' agreement may have made some provision regarding the suit already filed by Newlin.[12] Under such circumstances that court did not act improperly in awarding the relief requested.[13] We note, in this regard, the

---

11. Such offer specified the seller must furnish to the buyer "an abstract of title certified to date by a competent abstractor showing merchantable or insurable title in the owner, free of all encumbrances, except as stated herein and except any restrictions and easements of record" and further provided "[i]f title insurance is necessary the cost thereof shall be paid by the owner."

12. As noted earlier, the Webb Company filed a motion to intervene, following the trial court's judgment, which alleged its interest in the property would be adversely affected by such judgment. However, the exhibit submitted with the Webb Company's petition consisted only of the recorded memorandum of the actual contract between Webb and the appellants, which memorandum further recited the parties

"desire to keep the terms of said Contract confidential." Thus, even at the time of the filing of the motion to intervene, the record in the instant litigation did not disclose the actual interests of the Webb Company.

13. Appellants also contend they did not file any motion to dismiss for failure to join a party needed for just adjudication pursuant to T.R. 12(B)(7) and T.R. 19 because Newlin's amended complaint also sought damages, although they also suggest in their brief that "[w]here, as in the instant case, a vendor *is alleged* to have sold the same real estate to two purchasers, the second purchaser is clearly a necessary party in any action for specific performance by the first purchaser." (Emphasis added.) Significantly, however, Newlin's amended complaint

general rule of law to the effect that "failure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it." *P. R. Mallory & Co., Inc. v. NLRB,* (7th Cir. 1968) 400 F.2d 956, 959, *cert. denied,* (1969) 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452. *See also* 12 I.L.E. *Evidence* § 25 (1959). This Court cannot determine, any better than could the trial court, in what manner the transaction was "carried out" and whether the final contract with Webb would make conveyance to Newlin inequitable, as contended.

Finally,[14] North and the other appellants also contend that since Newlin was allegedly returned to his original position when his $100,000 earnest money deposit was refunded, and he thus suffered no monetary injury, any further relief under the circumstances was inappropriate. With respect to such argument, they quote the following language found in *Ames v. Ames,* (1910) 46 Ind.App. 597, 610, 91 N.E. 509, 514:

> "In the very nature of the case, there must appear some injury in the refusal to perform before a court is warranted in awarding a decree of performance. As we have seen in the case at bar, the refusal of performance by appellant at the time it was made put appellee in exactly the same position she was in before the contract was entered into. In such case, it does not seem there are any grounds for equitable interposition."

The *Ames* Court noted "[a]ppellee had paid nothing on the contract. . . ." *Id.* at 608, 91 N.E. at 513. Even assuming such principle could be applied where, as here, a party had made an earnest money deposit which was returned only after the breaching party had indicated his intention not to perform, it is significant that in *Ames* it was also stated:

> "It is clear, therefore, that denial of performance could work no injury to her *except to deprive her of a good bargain, which, as we believe, she was not entitled to profit by under the circumstances.* (Emphasis added.)

*Id.* at 608, 91 N.E. at 513. The facts in that case, in contrast to those in the case at bar, involved an advantageous agreement with a 62-year old party, in ill health, who the Court concluded "did not comprehend what the nature of the contract was." *Id.* at 608, 91 N.E. at 513.

Significant in this context, this Court, in the case of *Bauermeister v. Sullivan,* (1928) 87 Ind.App. 628, 634, 160 N.E. 105, 107, has suggested that the injury suffered where a contract for the sale of land is involved may not generally be equated with simple monetary damages, and may in fact be peculiar to the buyer, for the reason that "the exact counterpart of any particular piece of real estate does not exist anywhere else in the world." Accordingly, the rule is that:

> "Whenever a contract concerning real property is in its nature and incidents entirely unobjectionable—that is, when it possesses none of those features, which, as we will see, appeal to the discretion of the court—it is as much a matter of course for a court of equity to decree a specific performance of it, as it is for a court of law to give damages for a breach of it. * * * The rule having been once established, is now universal. The actual motives and designs of the purchaser are

did not allege, as suggested, that the property had been sold to two purchasers, and the damages which were sought (for lost rents and profits, plus interest, court costs and attorney fees) were as an incident to specific performance rather than in the alternative.

As noted above, appellants also concede that no affirmative answer of impossibility of performance was raised pursuant to T.R. 8. In this regard, however, they assert the pleadings were amended by the evidence presented at trial pursuant to T.R. 15(B), a proposition with which we do not necessarily agree in light of the failure of proof noted herein.

14. No argument is made, and thus we do not consider whether the award of specific performance in the instant case was improper because it would require the court's protracted administration of the terms of the conditional sales contract over an extended period of installment payments by Newlin. *See generally Risk v. Thompson,* (1958) 237 Ind. 642, 147 N.E.2d 540, a case cited by the appellants with respect to the issue of waiver discussed below, and *Louisville, New Albany & Chicago Railway Co. v. Bodenschatz Stone Co., supra.*

never inquired into, for it is assumed in every instance that damages are an inadequate relief for the breach of a land contract."

See also *Walcis v. Kozacik*, (1927) 86 Ind. App. 484, 156 N.E. 589. The *Bauermeister* Court further observed the Court in *Ames v. Ames, supra,* like that in *Harter v. Morris,* (1919) 72 Ind.App. 189, 123 N.E. 23, an additional authority cited by the appellants, "made inaccurate statements of the law" by failing to distinguish the general rule involving specific performance of contracts from "the different rule as to land contracts." *Id.,* 87 Ind.App. at 636, 160 N.E. at 107. We believe that on the facts presented to the trial court, noted above, no error was committed in finding the equities were with Newlin in favor of specific performance.

## Did Newlin Waive His Right to Specific Performance?

■ The further argument that Newlin "waived" any right to specific performance by demanding and accepting return of his $100,000 earnest money deposit appears to be without substantial merit, despite the assertion in 81 C.J.S. *Specific Performance* § 25 at p. 753 (1977) that "specific performance may be denied a vendee who has brought a prior action to recover a deposit or earnest money under the contract, or a suit to quiet title, since the institution of such a suit amounts to a repudiation of the contract." In the instant case, of course, Newlin brought no prior action to recover his deposit, and indeed even after receiving such deposit informed the appellants at the meeting on Saturday morning (according to Keesling's notes introduced into evidence) that "we've bought [the] farm and if you don't think we have, there will be a lawsuit." Such assertion does not necessarily show, as is required by the waiver doctrine, that the "remedy" pursued by Newlin at that time was *"inconsistent* with that of

15. Nor, in light of such assertion by Newlin, does the instant case involve an "agreement" which has the effect of *ratifying* an otherwise actionable wrong such as that involved in *V. H. Juerling & Sons, Inc. v. First National Bank of Richmond,* (1968) 143 Ind.App. 671, 242 N.E.2d 111 (an agreement with the forger of checks

specific performance." 81 C.J.S. *Specific Performance* § 25 at p. 753 (1977). (Emphasis added.)[15] Moreover, Keesling's notes further suggested that based on his recollection, Newlin merely received the earnest money check at the initial urging of Pearlman, who stated, "Here is your check, we don't need it anymore," although Newlin's own recollection expressed in his testimony was that Newlin had asked to have the money returned. Based on such facts, the trial court was not required to conclude Newlin waived any right to specific performance.

The decision of the trial court is affirmed.

YOUNG, P. J., and CHIPMAN, J., concur.

was held to ratify the payment of such checks by the bank), even if we were to assume the mere recovery of Newlin's earnest money deposit amounted to a "substantial benefit" under *Juerling* in light of the unique injury suffered by the breach of a land contract.