Ross **FOXWORTHY**, as Personal Representative of the Estate of James Rex Foxworthy, Deceased, and James Thomas Foxworthy, Appellants–Plaintiffs,

v.

**HEARTLAND CO–OP, INC.,**
Appellee–Defendant.

No. 54A04–0009–CV–374.

Court of Appeals of Indiana.

June 27, 2001.

Grover B. Davis, Davis & Shanley, Indianapolis, IN, Terence K. Ankner, Fishman Ankner & Horstmann, L.L.P., Boston, MA, Attorneys for Appellants.

C. Rex Henthorn, J. Lamont Harris, Henthorn Harris & Weliever, Crawfordsville, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Ross Foxworthy, as personal representative of the estate of James Rex Foxworthy (Rex), and James Thomas Foxworthy (referred to collectively as Foxworthy) appeal the trial court's grant of summary judgment in favor of defendant Westland Co–Op, Inc.[1] Foxworthy presents four issues which we consolidate and restate as: Did the trial court err when it found that Westland owed no duty of care to Rex?

We affirm.[2]

In 1991, Rex began working as a fertilizer applicator and general laborer at Westland's Romney facility in Tippecanoe, Indiana. Westland provides crop production services, including selling seeds, fertilizer, lime, and similar farm products. While Westland stores fertilizer at its facilities, it does not store lime. Rather, Westland places an order for lime, and an independent trucking company delivers the lime to the customer's property. The customer can then hire Westland to spread the lime for an additional $4.00 per acre.

Westland had a 1974 Allis–Chalmers Front End Loader (the loader) that was shared among its Romney, Cherry Grove, and New Richmond facilities. The loader was transported, generally by truck and trailer, to the customer's property and used to take large amounts of lime from the pile and deposit the lime into a spreader. The spreader was then used to spread lime onto the fields. While loading the lime into the spreader, the loader's brakes and steering were not significantly utilized, nor did the loader travel with any speed because the distance the loader traveled between the spreader and the pile was minimal. At the Romney facility, Rex and Dave Young were the primary users of the

1. Heartland Co–Op, Inc., the named defendant, merged with West Central Indiana Cooperative Association, Inc. on January 1, 1999. The surviving corporation is now known as Westland Co–Op, Inc. For the sake of consistency with the record and the parties' briefs, we refer herein to the defendant as Westland.

2. Oral argument was held in Indianapolis on May 14, 2001.

loader.[3] This facility handled over 3,500 tons of lime each year, and Rex loaded ninety percent of this lime. Rex was the person most familiar with the loader.

Westland allowed its employees to borrow its equipment to spread any fertilizer or lime purchased from Westland on their fields, provided that they obtain permission from the facility manager. Rex placed an order for lime with Westland in January or early February 1998. On or about February 6, 1998, Rex asked the fertilizer manager at Westland's Cherry Grove facility if he could use the loader and spreader during the upcoming weekend to spread the lime that had been delivered to his fields earlier that week. The manager gave Rex permission to borrow the equipment.

On February 7, Rex worked at the Romney facility until approximately noon. Rex then drove the spreader to the home of his father, James Foxworthy. Rex asked James to take a truck and accompany him to one of his fields, where Rex would leave the spreader and then the two could drive to the Cherry Grove facility to retrieve the loader. The loader had been parked outside at the Cherry Grove facility for Rex. The trailer that was commonly used to transport the loader was also outside and available to Rex. Rex, however, chose to drive the loader to his fields that were approximately three miles away.

He drove the loader from the facility east on County Road 550 North, with James following approximately fifty feet behind in his truck. James observed Rex having difficulty steering from the very beginning. Rex drove at a constant speed and with the bucket approximately three feet off the ground. A motorist who passed Rex opined that Rex was operating the loader in a safe manner and traveling at a reasonable speed. After traveling over two miles, Rex approached a banked, ninety-degree curve to the left. He slowed his speed to approximately ten miles per hour and was traveling in low forward gear. Near the end of the curve, Rex lost control of the loader and could not straighten it out. The loader veered across the centerline and into the ditch on the other side of the road. The force with which the loader's front left wheel came into contact with the ditch ejected Rex and the seat cushion on which he was sitting. He was thrown in front of the loader's left rear tire, which was riding in the ditch while the right tires were on the road. The left rear tire ran over Rex's head and chest, killing him instantly.

Following the accident, Foxworthy retained Orla Holcomb, a mechanical engineering expert, to inspect the loader. Holcomb discovered that half of the service foundation brakes was disconnected and the other half was nonfunctional. Thus, the loader had no functional brakes. Holcomb also found defects in the steering system that he opined would have caused difficulty in maintaining directional control of the loader. He further observed that the loader had no seatbelt and no door on the driver's compartment. Holcomb opined that the loader was defective, dangerous, and unfit for use and that the lack of any braking system, seat belt, and door and the defective steering system all contributed to Rex being ejected from the loader.

Foxworthy subsequently filed a complaint for damages against Westland, alleging negligence and negligent infliction of emotional distress. On April 21, 2000, Westland filed a motion for summary judgment, arguing that it did not owe Rex a duty of care. Following a hearing, the

---

**3.** Vicki Miller was the primary operator of the loader at the Cherry Grove facility.

trial court granted Westland's motion for summary judgment. Additional facts will be provided as necessary.

■■■ When reviewing the grant of a summary judgment motion, we apply the same standard as the trial court. Summary judgment is appropriate only where the designated evidentiary matter shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *City of Indianapolis v. Johnson,* 736 N.E.2d 295 (Ind.Ct.App.2000). We resolve all facts and reasonable inferences therefrom in favor of the nonmoving party. *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.,* 741 N.E.2d 383 (Ind.Ct.App. 2000).

■ We note that the trial court entered findings of fact and conclusions of law in its order granting summary judgment. While such findings and conclusions are helpful in clarifying the trial court's rationale, they are not binding on this court. *Whitley County Teachers Ass'n v. Bauer,* 718 N.E.2d 1181 (Ind.Ct. App.1999), *trans. denied* (2000).

■■■ To recover under a theory of negligence, a plaintiff must establish the following three elements: (1) a duty owed by the defendant to conform its conduct to a standard of care arising from its relationship with the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by the breach of that duty. *City of Indianapolis v. Johnson,* 736 N.E.2d 295. "Absent a duty, there can be no breach and, therefore, no recovery in negligence." *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.,* 741 N.E.2d at 386. The existence of a duty is a pure question of law for the court to determine. *City of Indianapolis v. Johnson,* 736 N.E.2d 295. Factual questions, however, may be interwoven in the issue of duty, rendering the existence of a duty a mixed question of law and fact to be determined by the factfinder. *Jacques v. Allied Bldg. Servs. of Indiana, Inc.,* 717 N.E.2d 606 (Ind.Ct.App. 1999).

■ In *McGlothlin v. M & U Trucking, Inc.,* 688 N.E.2d 1243 (Ind.1997), our supreme court rejected the latent/patent distinction and adopted the Restatement (Second) of Torts §§ 388 and 392 [4] (1965) to be used when determining whether a supplier of a dangerous chattel has a duty to inspect, discover, and warn the borrower. *Id.* at 1245 ("[w]hen the alleged negligence is the supplying of a defective chat-

---

4. § 392 provides:

One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

    (a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied or,

    (b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.

This section is not applicable in the instant case because Rex was not planning to use the loader in furtherance of Westland's business purposes. "[W]here use of the chattel is permissive, the chattel is supplied gratuitously and not in furtherance of the supplier's business purpose." *Bogard v. Mac's Restaurant, Inc.,* 530 N.E.2d 776, 779 (Ind.Ct.App.1988) (holding that supplier owed no obligation under § 392 to exercise due care for the safety of plaintiff, an independent contractor, who was permitted to use ladder while working on supplier's business, as there was no evidence that supplier promised to supply plaintiff with the tools necessary to maintain supplier's premises), *trans. denied* (1989).

tel that causes injury, the appropriate considerations are better reflected in Sections 388 and 392 of the Restatement (Second) of Torts"). The court further noted that the factors incorporated in each of these sections are consistent with our recent jurisprudence regarding the determination of whether a duty exists, *i.e.*, the relationship of the parties, the reasonable foreseeability of harm to the person injured, and public policy concerns. *Id.*

§ 388 provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by .its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

    (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

    (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

    (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

■ Foxworthy first notes, and we agree, that there is no serious dispute as to whether Westland knew that the loader was or was likely to be dangerous when driven on the road. The designated evidence reveals that in January 1998, one of

Westland's mechanics informed Phil Pirtle, Westland's risk manager, that the brakes and steering systems on the loader needed to be fixed and that he could fix them. Pirtle responded that Westland would not fix the breaks or steering because it was too busy. Westland's awareness of the loader's dangerousness is also evident in light of a previous accident, one or two years prior to the instant fatal accident, in which Roger Davies lost control of the loader and ran off the road, striking a fence. Davies's accident was common knowledge among Westland employees. Finally, while no formal warnings were issued by Westland, Pirtle did advise employees to use the trailer and avoid driving the loader on the road if possible. Pirtle further recommended that if the loader was operated on the road, they should drive slowly and keep the bucket low to the ground "so that the bucket could be used to help stop the Loader in an emergency." *Record* at 311.

Thus, the focus of our inquiry is § 388(b). Foxworthy argues that genuine issues of material fact exist regarding whether Westland had reason to believe that Rex would realize the loader's dangerousness and that the trial court, therefore, erred in finding that as a matter of law no duty existed.[5]

Foxworthy notes that Westland employees, including Rex, were never specifically told by Westland that the loader had a defective steering mechanism and an inoperable brake line. Foxworthy further observes that no formal warnings of the loader's dangerousness were issued by Westland, and that Vicki Miller, Rex's counterpart at the Cherry Grove facility, was not aware of the loader's inoperable brake line and inadequate steering mecha-

---

5. Foxworthy also argues that there is a material issue of fact as to whether Westland exercised reasonable care to inform Rex of the loader's dangerous condition. These facts involve breach of duty rather than existence of a duty. Therefore, they are not material to the issue before us.

nism. Foxworthy asserts that this evidence "supports the conclusion that Westland's employees were **not** aware of the very condition that made the loader dangerous." Appellant's Brief at 23 (emphasis in original). We observe, however, that the inquiry is not what the employees actually knew but, rather, what Westland had reason to believe Rex would realize about the loader's dangerousness. Further, the extent of Westland's warnings to its employees is not relevant to the question of whether a duty exists.

Foxworthy also observes that while Rex was a primary user of the loader, he was not a mechanic and the only maintenance-related repairs he made involved changing oil filters and maintaining oil levels. Moreover, Foxworthy asserts that Rex's primary use of the loader to load lime did not require him to drive the loader more than a few feet at any given time and, therefore, Rex was not on notice of the extent of the danger that the loader presented. Based on this evidence, Foxworthy argues that there is a genuine issue of material fact regarding whether Westland had reason to believe that Rex would realize the loader's dangerous condition. We cannot agree.

The undisputed designated evidence reveals that Rex was a primary user of, and the Westland employee most familiar with, the loader. While there is no direct evidence that Rex had previously operated the loader outside the context of loading lime, there is evidence that several other employees had operated the loader on the road. It was common knowledge among the employees that Davies, Rex's supervisor, had lost control of the loader and run into a fence while operating it on the road. Finally, through her experience with the loader as Rex's counterpart at the Cherry Grove facility, Miller knew of the loader's "mechanical problems" and even told Pirtle that when she drove the loader on the road, she always kept the bucket low so that, "in case of an emergency, [she] could drop the bucket to serve as brakes." *Record* at 136. Based on his operation of the loader, Young, the other primary user of the loader, was also aware of problems with the loader's brakes and that the loader's articulated steering system made it difficult to drive on a paved road.

In light of the above evidence, we conclude that Westland had reason to believe that Rex would realize the loader's dangerous condition. The trial court properly determined as a matter of law that Westland owed no duty to Rex under § 388.

Foxworthy also argues that Restatement (Second) of Torts § 388 does not define all of the duties of care a supplier owes to a borrower of chattel. In particular, Foxworthy asserts that Westland owed Rex a common law duty to use reasonable care to maintain the loader in a safe and operable condition.[6]

While we agree that in certain instances a supplier may owe duties beyond § 388's

---

**6.** Foxworthy also asserts other duties, of which we dispose. First, Foxworthy attempts to present the issue of a statutory duty to maintain the loader by simply referring us to argument in one of Foxworthy's briefs to the trial court. This is improper appellate practice, and the issue is waived. *See Bigler v. State,* 732 N.E.2d 191 (Ind.Ct.App.2000), *trans. denied.*

Second, Foxworthy directs us to § 408 of the Restatement and briefly argues that Westland had a duty as a lessor to remove the defective loader from its inventory. Foxworthy notes that although this section deals with leases, it is applicable to the instant case because the section equally applies to bailors. To support this proposition, Foxworthy cites *Coca–Cola Bottling Co. v. Vendo Co.,* 455 N.E.2d 370 (Ind.Ct.App.1983) with the following parenthetical: "noting that a 'bailor' is a 'lessor.'" Appellant's Brief at 43–44 n. 20. We initially observe that the cited case does not address § 408. Further, *Coca–Cola Bottling Co.* notes that a lessor is a bailor. Al-

duty to warn,[7] we do not believe that the circumstances of this case warrant extending Westland's duty beyond § 388. Specifically, we observe that Rex was not required by Westland to use the loader to spread his lime and was not acting within the scope of his employment or in furtherance of Westland's business purposes at the time of the accident. We conclude, therefore, that our common-law considerations of relationship, foreseeability, and public policy are adequately addressed in this case by § 388.

Judgment affirmed.

BAILEY, J., and MATTINGLY–MAY, J., concur.

though that is a correct statement of law, logic dictates that the converse of such a proposition is not necessarily true. In the instant case, Westland was clearly not a lessor.

Finally, in a footnote and without citation to any authority, Foxworthy asserts that a duty exists under § 389 of the Restatement. We have previously noted that § 389 has not been adopted in Indiana. *Downs v. Panhandle Eastern Pipeline Co.,* 694 N.E.2d 1198 (Ind.Ct. App.1998), *trans. denied.* Foxworthy presents no cogent argument for our adoption of this section.

7. For example, if the chattel is to be used for the supplier's business purposes, § 392 imposes a duty to exercise reasonable care to either make the chattel safe for its intended use or discover its dangerous condition and inform expected users.