**SCI INDIANA FUNERAL SERVICES, INC., Appellant–Defendant,**

**v.**

**D.O. McCOMB & SONS, INC. and Terra Services, Inc., Appellees–Plaintiffs.**

**No. 02A03–0401–CV–22.**

Court of Appeals of Indiana.

Jan. 14, 2005.

James P. Fenton, Eilbacher Scott, P.C., Fort Wayne, IN, Craig E. Pinkus, George T. Patton, Jr., Bryan H. Babb, Bose McKinney & Evans, LLP, Indianapolis, IN, Attorneys for Appellant.

Daniel K. Leninger, Beers Mallers Backs & Salin, LLP, Fort Wayne, IN, Attorney for Appellees.

## OPINION

BAKER, Judge.

Appellant-defendant SCI Indiana Funeral Services, Inc. (SCI) appeals from the grant of summary judgment in favor of the appellees-plaintiffs D.O. McComb & Sons, Inc. (McComb) and Terra Services, Inc. (Terra) (collectively referred to as McComb). Specifically, SCI argues that: (1) the trial court erred in determining that McComb was entitled to specific performance by SCI pursuant to an agreement that McComb had previously entered into with another party; (2) a supplemental affidavit that SCI had submitted relating to the parties' motions for summary judgment was erroneously stricken by the trial court; (3) the agreement was not enforceable in either law or equity; and (4) a genuine issue of material fact exists as to whether the agreement "runs with the land" so as to bind subsequent parties. Finally, SCI argues that summary judgment was improper because ordering specific performance of the agreement would subject it to criminal prosecution under

Indiana Code section 23–14–46–7, the Exclusive Rights Act, which affords a cemetery owner the exclusive right to perform certain functions, including the opening and closing of a gravesite.

We conclude that the trial court erred in striking the supplemental affidavit that was submitted by SCI, and that McComb failed to show that it was entitled to specific performance under the agreement. Moreover, we conclude that our legislature's enactment of the Exclusive Rights Act did not violate the Contracts Clause as set forth in Article 1, Section 24 of the Indiana Constitution. Hence, the entry of summary judgment for McComb on the basis that the application of the Exclusive Rights Act is unconstitutional also amounted to error. We therefore reverse the judgment of the trial court and remand with instructions that summary judgment be entered in favor of SCI.

### FACTS [1]

On June 29, 1989, McComb initiated an antitrust action in the United States District Court against a number of defendants, including Highland Park Cemetery (Highland Park). McComb and Terra are both duly organized Indiana corporations, and McComb is engaged in the business of undertaking, embalming and directing funerals of deceased individuals. Its business includes the related services of selling caskets, vaults, opening and closing gravesites, and selling and installing monuments. Terra is a wholly owned subsidiary of McComb that is also engaged in the business of opening and closing grave sites and selling and installing monuments.

Highland Park owned and operated a cemetery consisting of approximately 126 acres in Fort Wayne. The cemetery engaged in, among other things, the sale of gravesites, cemetery maintenance, interment and the sale of vaults and monuments. In the antitrust suit, McComb alleged in part that Highland Park and the other cemeteries "had illegally restricted [McComb's] ability to open and close graves and had illegally tied the opening/closing service to the purchase of a cemetery lot—a market over which [Highland Park] held a monopoly." Appellant's App. p. 37.

In 1993, McComb and Highland Park settled the antitrust action and executed a written "Agreement of Settlement and Release" (the Agreement). Addendum to Appellant's Br. p. 104–29. The Agreement sets forth a business relationship of unlimited duration between McComb and Highland Park, requiring both parties to perform various duties that involved marketing, selling, paying for, and insuring each other's products and services.

Some specific examples of the parties' obligations under the Agreement included McComb's right to sell, open and close the cemetery's gravesites. McComb's employees could open and close the gravesites, or they could subcontract that service to Highland Park for a fee that was established in the Agreement. McComb was also granted the right to sell, excavate and construct foundations for monuments or markers, and they had the non-exclusive right to sell cemetery gravesites with remuneration to Highland Park. It was also agreed that Highland Park would conduct training sessions with McComb personnel, for which McComb would pay Highland Park the sum of $1500 per class. Highland Park was also responsible for marketing McComb's funeral services to members of families whose deceased relatives might be interred at Highland Park.

---

1. We heard oral argument in this case on December 16, 2004, in Indianapolis. We commend counsel for their able presentations.

McComb also agreed to exchange current and updated retail price lists and commission schedules to facilitate the cross-marketing services. McComb was to name Highland Park on an indemnification insurance policy in the amount of $10,000, or post an equivalent cash bond with a third party bank "to serve as security for the conduct of McComb and Terra on [Highland Park's] property." Appellant's App. p. 115. The Agreement further provided that McComb could file documentation with the county recorder "which states that the cemetery operations are subject to the terms and conditions of the [A]greement." Appellant's App. p. 117. Finally, the Agreement provided that it was to be binding upon Highland Park's assigns, successors in interest of any kind, and purchasers of any of Highland Park's assets.

Over the next three and one-half years, McComb did not file any documentation with the county recorder to make the Agreement a matter of public record. Also, at no time during the pendency of the Agreement did McComb actually open or close any graves at Highland Park.

On or about May 8, 1997, the President of Highland Park, Martin E. Staehlin, sent a letter to McComb, notifying it that Highland Park's assets were being acquired by SCI, and that it would no longer abide by the Agreement. Such arrangements included "openings and closings, monument foundations, and pre-need sales and services." Appellant's App. p. 136. On that same day, a corporate deed conveying the real estate where Highland Park is located was filed in the Allen County Recorder's Office wherein Highland Park was named as the grantor and SCI was named as the grantee. Later that month, SCI acquired Highland Parks' assets and began operating the cemetery. After May 8, 1997, McComb demanded SCI's compliance with the Agreement to the extent that McComb could continue to use Highland Park under the terms of the Agreement. However, SCI refused McComb's demands.

Approximately two months later, on July 1, 1997, our legislature enacted the Exclusive Rights Act, which provides in pertinent part that "Because the owner of a cemetery is responsible for the performance of the care and maintenance of the cemetery, a cemetery owner has the *exclusive right* to," among other things, "*open and close a grave or grave space, burial space, crypt, or niche in the cemetery.*" Ind.Code § 23–14–46–7 (emphasis added). The General Assembly also determined that violations of the Act would result in criminal prosecution under Indiana Code section 23–14–46–8 and Indiana Code section 35–50–3–3.

On September 15, 2000, McComb filed a complaint against SCI for breach of the Agreement, as well as intentional interference with a contractual relationship. An amended complaint was filed on March 7, 2001, claiming entitlement to damages, along with equitable and injunctive relief to compel compliance with the terms of the Agreement.

Sometime thereafter, McComb filed a motion for partial summary judgment, contending that there was no genuine issue as to any material fact and that they were entitled to the issuance of a permanent, mandatory injunction against SCI, such that SCI was to specifically perform or otherwise comply with the terms of the Agreement. SCI then filed a cross-motion for summary judgment on November 25, 2002. SCI contended that because there was no description of the land that the Agreement purported to burden, McComb could not claim any right to use the property—and no easement had been created—that is now owned by SCI. Moreover, SCI asserted that no dominant estate was

expressed in the Agreement. As a result, no covenant could run with the land and, therefore, it was entitled to summary judgment.

SCI also claimed that the letter sent from Highland Park to McComb properly terminated the Agreement because the document contained no specific time of termination. Thus, SCI maintained that either party could terminate the Agreement at will. Additionally, SCI asserted that it was not in privity with McComb and, therefore, the Agreement could not be enforced. Finally, SCI argued that summary judgment should be granted in its favor because of the complicated nature of the Agreement, and the trial court "could be required to intervene on a daily basis in perpetuity to resolve possible disputes." Appellant's App. p. 10.

On August 23, 2003, the trial court issued an interim order, stating in pertinent part that:

The Court is concerned that an inadequate record is laid for the provision of such remedies. The Court is advised by Attorney Fenton that the Defendant would also prefer to present further argument on the issue of whether public policy, by virtue of recent legislation, affects the remedies proposed by the Plaintiffs. The Court requests that counsel provide the Court with appropriate affidavits and memorandums [sic] of law which provide further foundation for the Court's consideration of the remedies of injunctive relief and specific performance. The parties may also brief the Court on the public policy question of such remedies.

Appellant's App. p. 327. In response to this order, SCI filed the affidavits of Larry Jenkins and Thomas Pehlke. Appellant's App. p. 350–58. Jenkins was the vice president of Highland Park, and Pehlke was the general manager of SCI. McComb then moved to strike the Pehlke affidavit. Then, on December 17, 2003, SCI submitted Jenkins's supplemental affidavit, and McComb moved to strike that evidence on the same day. After a hearing, the trial court ultimately determined that McComb was entitled to partial summary judgment as a matter of law. The trial court also granted McComb's motion to strike parts of Pehlke's affidavit as well as the supplemental affidavit that had been submitted by Jenkins. In part, the findings of fact and conclusions of law entered on January 6, 2004, provided as follows:

16. The terms of the Agreement are clear and unambiguous.

. . .

21. SCI was fully aware of the terms of the Agreement at and prior to the time it purchased Highland Park's assets, i.e. SCI had actual knowledge of McComb and Terra's interest in and use of Highland Park Cemetery.

. . .

25. The Agreement created a[n] easement in gross, an irrevocable license, and an equitable servitude on Highland Park Cemetery for the benefit of McComb and Terra.

26. As an easement in gross the Agreement created nonpossessory rights, given in perpetuity, to enter and use Highland Park Cemetery and obligated Highland Park not to interfere with the authorized uses.

27. The nonpossessory rights created under the Agreement 'touch and concern' the land because the contract, as a whole, relates to the physical use of the Highland Park Cemetery and is logically connect-

ed to the Highland Park Cemetery.

28. The fact that the Agreement provided for a memorandum to be recorded at the Recorder's Office demonstrates the intent of the parties to create a servitude on the property.

29. The fact that the Agreement expressly provided that it bound all 'assigns, successors in interest of any kind whatsoever, purchasers of their assets and/or liabilities' demonstrates the intent of the parties that the servitude on Highland Park Cemetery run with the land.

30. The Agreement, since it was given in exchange for substantial consideration, further created an irrevocable license to use Highland Park Cemetery for the benefit of McComb and Terra.

31. As an easement in gross or irrevocable license, Highland Park cannot unilaterally terminate the Agreement.

32. The Agreement created an equitable servitude which does not depend upon whether there is privity or whether the covenant runs with the land.

33. The equitable servitude should be enforced against SCI since it had actual notice of the Agreement, including the covenants concerning Highland Park Cemetery, made between Highland Park, SCI's predecessor in interest, and the Plaintiffs when SCI took title to the Highland Park Cemetery.

34. There is no genuine issue of material fact and McComb and Terra are entitled to partial summary judgment as a matter of law.

35. Since SCI admits that it was fully aware of the terms of the Agreement before purchasing and receiving title to Highland Park Cemetery, the Agreement is binding and enforceable upon SCI as a contract binding upon the successor in interest to Highland Park Cemetery and as an easement, irrevocable license, and equitable servitude.

36. Should employees or agents of the Plaintiffs, in opening and closing gravesites at Highland Park Cemetery, cause damage to an existing gravesite, the living relatives of the deceased person at such gravesite would be aggrieved and troubled by such damage.

37. Notwithstanding the potential for damage to existing gravesites as aforementioned, I.C. 23–14–46–7 and 23–14–47–1 et seq. do not nullify the Settlement Agreement reached by the Plaintiffs and Defendants' predecessor within this cause of action.

. . .

41. McComb and Terra have the legal and equitable right to enforce the Agreement according to its unambiguous terms.

Appellant's App. p. 477–81. In light of these findings, the trial court determined that McComb was entitled to specific performance of the Agreement and SCI was prohibited from interfering with McComb's use and/or enjoyment of Highland Park. Additionally, the trial court found that McComb was entitled to a permanent, mandatory injunction specifically compelling SCI to comply with the terms of the Agreement. SCI now appeals from this order.

## DISCUSSION AND DECISION

### I. Standard of Review

Our standard of review on appeal with respect to summary judgment is well settled. The purpose of summary judgment is to end litigation about which there can be no factual dispute and that may be determined as a matter of law. *LeBrun v. Conner*, 702 N.E.2d 754, 756 (Ind.Ct.App. 1998). When reviewing a decision on a summary judgment motion, we apply the same standard as the trial court. *Wickey v. Sparks,* 642 N.E.2d 262, 265 (Ind.Ct. App.1994), *trans. denied.* Summary judgment is appropriate only when the designated evidentiary material shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *State Farm Fire Cas. Co. v. T.B. ex rel. Bruce*, 762 N.E.2d 1227, 1230 (Ind.2002). Therefore, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was erroneous. *Jordan v. Deery*, 609 N.E.2d 1104, 1107 (Ind.1993). Nevertheless, we carefully review the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *State Farm*, 762 N.E.2d at 1230.

We also note that summary judgment orders do not require specific findings or conclusions. *Jones v. W. Reserve Group/Lightning Rod Mut. Ins. Co.*, 699 N.E.2d 711, 714 (Ind.Ct.App.1998), *trans. denied.* Pursuant to Trial Rule 56(C), the trial court must state the issues and claims upon which summary judgment is granted only when summary judgment is granted upon less than all the issues. *Wolfe v. Stork RMS–Protecon Inc.*, 683 N.E.2d 264, 267 (Ind.Ct.App.1997). Otherwise, the rule imposes no requirement upon the trial court to state the specific legal basis for granting summary judgment. *Id.* Moreover, although the trial court's findings and conclusions facilitate appellate review and offer valuable insight into the trial court's rationale for its decision, they are not binding upon this court. *Foxworthy v. Heartland Co-Op, Inc.*, 750 N.E.2d 438, 441 (Ind.Ct.App.2001).

### II. SCI's Contentions

#### A. Affidavit Stricken By the Trial Court

■ SCI contends that the trial court erred in granting specific performance to McComb because, among other things, it erroneously granted McComb's motion to strike Jenkins's supplemental affidavit that SCI had submitted. In particular, SCI argues that the affidavit—which the trial court impliedly had invited it to file—provided additional evidence to rebut McComb's assertion that it had satisfied its obligations under the Agreement. SCI asserts that the affidavit set forth specific examples of McComb's nonperformance of essential obligations under the Agreement, including McComb's refusal to participate in quarterly training sessions. Thus, SCI maintains that McComb's motion to strike should have been denied.

As we observed in *Kesler v. Marshall*, 792 N.E.2d 893, 896 (Ind.Ct.App.2004), *trans. denied,* evidence relating to a party's failure to perform is both relevant and admissible for determining whether specific performance is an appropriate remedy in a particular case. And here, it was SCI's burden to introduce evidence of McComb's inequitable conduct. *See North v. Newlin*, 416 N.E.2d 144, 151 (Ind.Ct. App.1981) (observing that in an action for specific performance of a land contract, the

defendant must prove extrinsic facts as a defense).

In the instant case, the record shows that the supplemental affidavit of Jenkins was filed by SCI on December 17, 2003. In the affidavit, Jenkins stated that at the time the Agreement was being negotiated, Highland Park was in difficult economic circumstances, that the federal antitrust litigation was a major financial burden, and that it was experiencing other financial difficulties. Appellant's App. p. 458. Jenkins further stated that Highland Park desired an expanded business relationship with McComb and that most of the negotiations with McComb leading up to the execution of the Agreement concerned its ongoing business relationship with McComb. *Id.* Jenkins went on to note that he became licensed and took training to sell McComb's products and tried to organize training sessions for McComb's personnel. However, Jenkins was unable to obtain McComb's cooperation, and the training sessions ended shortly after they commenced because of the lack of attendance by McComb personnel. *Id.* Jenkins further stated in the affidavit that he tried to persuade McComb to develop business for Highland Park but was unsuccessful, and that McComb's failure to generate new business for Highland Park was a major factor leading to the sale of Highland Park to SCI. *Id.* at 459.

In considering the above, it is apparent to us that evidence of McComb's inequitable conduct in being less than diligent in asserting its rights under the Agreement was both relevant and admissible to show that McComb had not fulfilled its obligations. Moreover, the evidence included in the affidavit does not vary or contradict any of the terms in the Agreement. Rather, that testimony provided additional evidence to rebut McComb's assertion that it had performed under the Agreement.

Hence, we find that the trial court erred in excluding this evidence when ruling on the motions for summary judgment.

### B. Specific Performance

■ In light of our disposition of the issue above with regard to the affidavit that had been stricken, we go on to address SCI's contention that it was entitled to summary judgment in light of the designated evidence establishing that McComb failed to take all reasonable steps to assert its contractual rights under the Agreement. In essence, SCI maintains that McComb has failed to satisfy its burden to prove that it substantially performed under the Agreement, which necessarily renders the remedy of specific performance unavailable. SCI asserts that the only evidence offered by McComb establishing its alleged performance under the Agreement was the conclusory affidavit submitted by David McComb stating that "all of the parties to this agreement performed according to the terms and covenants of the agreement until May 8, 1997." Appellant's App. p. 255.

■ In resolving these contentions, we first note that a party seeking specific performance "must prove that he has substantially performed his contract obligations or offered to do so." *Kesler*, 792 N.E.2d at 896. Also, a failure of consideration results when a party to a contract fails to perform those acts promised, so that if the undelivered consideration is allocable to an independent covenant by the other party, the contract may be avoided on a pro tanto basis. *Alber v. Standard Heating and Air Conditioning, Inc.*, 476 N.E.2d 507, 510 (Ind.Ct.App.1985).

We agree with SCI's contention—inasmuch as the record so reflects—that the only evidence McComb offered establishing its "performance" under the Agreement was the affidavit submitted by David W. McComb. As noted above, the affida-

vit contained the conclusory statement that all of the parties had performed under the Agreement. Appellant's App. p. 255. SCI, however, submitted designated evidence and argument that McComb had not fully performed because, among other things, it had never filed documentation with the county recorder to establish its interest as a matter of public record. Appellant's App. p. 260, 264. Shortly thereafter—as indicated above—the trial court's interim order expressed concern that "the remedy of injunctive relief on specific performance may not be appropriate." Appellant's App. p. 327. And it was concerned that there was an inadequate record for the provision of such remedies. *Id.* SCI presented evidence establishing that specific performance was improper because McComb had not fully performed under the Agreement as it had alleged. In particular, this designated evidence provided that:

1. The McCombs had never once performed an opening or closing of a gravesite at Highland Park in three-and-a-half years and had only once constructed a monument foundation.

2. The McCombs had failed to perform numerous essential and express provisions under the Agreement including, but not limited to, participating in mandatory quarterly training sessions with Highland park personnel for which Highland Park was to be paid $1500.00 per training session.

3. There was no evidence that the McCombs, among other things, (i) had named Highland Park on an indemnification insurance policy in the amount of $10,000 or posted an equivalent 'cash' bond with a third party bank or trust company 'to serve as security for the conduct of McComb and Terra on Highland's property' or (ii) had provided Highland Park with either an initial or revised pricing schedules for McCombs' services.

Appellant's App. p. 108, 112–13, 115, 350–51, 438, 447–52, 458.

While McComb moved to strike part of this evidence, it offered no evidence of its own at any time to address the trial court's concern about the possibility that an inadequate record had been established to support the remedy of specific performance. So, the trial court essentially ordered SCI to comply with the Agreement based upon the same evidence that the trial court had previously deemed "inadequate." What we are left with is McComb's single allegation of full performance to "prove" as a matter of law that it had "substantially performed" its contractual obligations under the Agreement.

Once again, we note the circumstances that were presented in *Kesler.* In *Kesler,* the plaintiff-seller brought an action against the defendant-purchaser seeking specific performance of a purchase agreement six years after the buyer had refused to close on the transaction. The trial court "ordered [the purchaser] to perform the contract." 792 N.E.2d at 895. On appeal, we reversed, finding that the seller had only partially performed under the purchase agreement, inasmuch as it had provided adequate zoning verification. *Id.* at 896. We recognized that the plaintiff's failure to substantially perform under the agreement prevented the trial court from ordering performance "according to, or substantially in accordance with, the precise terms agreed upon." *Id.* In denying specific performance, we cited to *Wagner v. Estate of Fox,* 717 N.E.2d 195 (Ind.Ct. App.1999), where we observed that the plaintiff had "waited nearly six years to file his suit and that equity aids the vigilant, not those who sleep on their rights." *Kesler,* 792 N.E.2d at 898 n. 1.

Here, it is apparent that the trial court's reasoning for ordering SCI to comply with the Agreement's terms hinged on the consideration flowing from the settlement and release of claims and counterclaims in the federal lawsuit, and other terms and covenants in the Agreement. However, while the trial court summarized the terms and covenants contained in the Agreement, the trial court never accounted for McComb's seven-year nonperformance that had been established. Thus, when reviewing the lack of evidence presented by McComb, along with the evidence contained in the affidavit that had been erroneously excluded, we must conclude that the grant of summary judgment in McComb's favor was error on this basis.

### C. Possible Criminal Prosecution

■ SCI's final contention that summary judgment was improperly entered for McComb—and perhaps the real essence of this case—is based upon the notion that it will be exposed to criminal prosecution in light of the legislature's enactment of the Exclusive Rights Act. SCI maintains that the statute's enactment was reasonably necessary for the protection of the health, safety, and welfare of the general public. Thus, SCI argues that the trial court's order of specific performance of the Agreement serves as a command for SCI to violate the law and subject it to the never-ending possibility of criminal prosecution.

■ In considering SCI's argument, we first note the provisions of the Exclusive Rights Act that were enacted on July 1, 1997:

Because the owner of a cemetery is responsible for the performance of the care and maintenance of the cemetery, *a cemetery owner has the exclusive right to:*

(1) open and close a grave or grave space, burial space, crypt, or niche in the cemetery;

(2) set or install a:

  (A) marker;

  (B) monument; or

  (C) any type of memorial;

in the cemetery; and

(3) install any kind of foundation or other type of base for the marker, monument, or any type of memorial in the cemetery.

This exclusive right may also be exercised by the authorized representative of the owner of the cemetery.

I.C. § 23–14–46–7 (emphasis added). We note that Article 1, Section 24 (the Contracts Clause) of the Indiana Constitution forbids "impairing the obligations of contracts." However, the State police power authorizes the enactment of legislation for the protection of health, safety and the general welfare. *See Paul v. Walkerton Woodlawn Cemetery Ass'n,* 204 Ind. 693, 184 N.E. 537, 540 (1933).

In its attempt to resolve the conflict between the contract clause and the police power in enforcing the Settlement Agreement against SCI, the trial court found that "[t]he statute and its attendant criminal penalties are not 'reasonably necessary' for the 'health, safety and welfare of the general public' and that an 'application of the criminal penalties to the parties herein in compliance with the Settlement Agreement would be unconstitutional.'" Appellant's App. p. 474. Hence, the trial court reasoned that applying the Exclusive Rights Act retroactively to the Agreement would violate prohibitions against ex post facto laws and the Contracts Clause.

The basis for the trial court's rationale in this case was its reliance upon the rule announced by our supreme court in *Clem v. Christole, Inc.,* 582 N.E.2d 780 (Ind.

1991), as to whether the Exclusive Rights Act is "reasonably necessary" to protect the health, safety and welfare of the general public." Appellant's App. p. 473. The trial court determined that an application of this statute could only protect those citizens who have deceased relatives buried at Highland Park, "a class of persons [who] could hardly be defined as the 'general public.'" Appellant's App. p. 473.

In our view, this finding is directly contrary to established case law. To be sure, in *Paul*, our supreme court upheld a statute prescribing duties, powers and obligations of the directors of a cemetery against a due process clause attack. Specifically, *Paul* involved assessments on a number of burial lots. Those assessments by the managers of a cemetery association were upheld as not in violation of the due process rights of the member lot holders. In part, the court ruled as follows:

> [I]t will suffice to say that . . . an incorporated [cemetery], being of public interest and of general public welfare, may call to its aid for the enforcement of its statutory authorizations a power which is inherent in the very nature of the corporation. This power, known as the police power primarily inherent in the state, may be delegated by the state to an entity of its creating and will be so regarded when necessary to carry forward an enterprise of public interest and general welfare.

184 N.E.2d at 540.

In our view, the Exclusive Rights Act seeks to limit potential problems, such as damage to existing gravesites, by limiting the right to open and close graves to the cemetery owner. There is no evidence here establishing the size of this "relatively small class of persons who could be affected by the activities contemplated by the Settlement Agreement." Appellant's App. p. 474. The trial court did not recognize

that the number of people affected by the decision will continually expand so long as Highland Park remains in operation. Hence, the Exclusive Rights Act is, indeed, reasonably necessary for the protection of the health, safety, and welfare of the general public, and the trial court erred in finding to the contrary.

Through the years, our statutes and caselaw have recognized the "symbolic importance that the bodies of the dead have for the hearts and minds of the living." *Ketchmark v. Northern Ind. Pub. Serv. Co.*, 818 N.E.2d 522, 524, n.1 (Ind.Ct.App., 2004) (quoting *Janicki v. Hosp. Of St. Raphael*, 46 Conn.Supp. 204, 744 A.2d 963, 964 (1999)). *See e.g.*, Ind.Code § 23–14–57–2 (pertaining to an order from the Health Department authorizing the removal of human remains regarding the re-interment, re-entombment, or re-inurnment); Ind.Code § 23–14–31–36 (requirements pertaining to the cremation of human remains); Ind.Code § 14–21–1–28 (providing that an individual who, with the intent to disturb ground for the purpose of discovering or removing artifacts, burial objects, grave markers, or human remains, disturbs buried human remains or grave markers in violation of a plan approved by the Department, commits a class D felony); Ind.Code § 23–14–57–1 (setting forth requirements that must be met before human remains may be removed from a cemetery); Ind.Code § 23–14–31–44 (setting forth requirements pertaining to the disposition of cremated human remains); Ind.Code § 14–21–1–27 (providing that an individual who fails to treat or rebury the human remains that have been disturbed in a manner and place according to rules adopted by the commission or a court order and permit issued by the Health Department, commits a class A misdemeanor). In our

view, these statutes lend further support to the conclusion that the Exclusive Rights Act protects the general public.[2]

■ Finally, we reject McComb's contention that it could lawfully perform the tasks enumerated in the Exclusive Rights Act because it was the authorized representative of the owner of the cemetery. As McComb correctly points out, owners of real estate enjoy the exclusive right to use and enjoy their real estate as they wish, and there is generally no prohibition against transferring such rights by way of mortgages, leases, easements and the like. Appellee's Br. p. 27. However, given McComb's status at this juncture, it is not reasonable to conclude that the General Assembly could have considered a third party engaged in litigation with a cemetery owner to be that owner's authorized representative. Instead, we believe it reasonable to infer from the language in the Exclusive Rights Act that the legislature meant only to extend the "exclusive right" to perform this type of work to the cemetery owner's employees, agents or other individuals who may be under the cemetery owner's direct "control." Quite simply, McComb does not fit this description. Hence, for all these reasons, summary judgment was improperly entered for McComb, and summary judgment should be granted to SCI.

The judgment of the trial court is reversed, and this cause is remanded to the trial court with instructions that it enter summary judgment for SCI.

FRIEDLANDER, J., and ROBB, J., concur.

---

2. On a related note, this court recently extended the rule for recovery in causes of action for the negligent infliction of emotional distress. In *Blackwell v. Dykes Funeral Homes, Inc.*, 771 N.E.2d 692 (Ind.Ct.App. 2002), *trans. denied*, we held that a decedent's parents were sufficiently and directly involved in an incident where the defendant funeral home lost the decedent's cremated remains, such that they could maintain a claim against the funeral home for the negligent infliction of emotional distress. *Id.* at 697. Notwithstanding the statutes cited above involving the sanctity and care that should be exercised in the final disposition of human remains, our decision in *Blackwell* has not been immune from criticism. *See* Babb, Emotionally Distressed in Indiana: Separate Tests For Primary Victims and Bystanders, Vol. 47, No. 4 RES GESTAE 26 (November 2003).